(Slip Opinion) OCTOBER TERM, 2011 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## WILLIAMS *v.* ILLINOIS

CERTIORARI TO THE SUPREME COURT OF ILLINOIS

No. 10–8505. Argued December 6, 2011—Decided June 18, 2012

At petitioner's bench trial for rape, Sandra Lambatos, a forensic specialist at the Illinois State Police lab, testified that she matched a DNA profile produced by an outside laboratory, Cellmark, to a profile the state lab produced using a sample of petitioner's blood. She testified that Cellmark was an accredited laboratory and that business records showed that vaginal swabs taken from the victim, L. J., were sent to Cellmark and returned. She offered no other statement for the purpose of identifying the sample used for Cellmark's profile or establishing how Cellmark handled or tested the sample. Nor did she vouch for the accuracy of Cellmark's profile. The defense moved to exclude, on Confrontation Clause grounds, Lambatos' testimony insofar as it implicated events at Cellmark, but the prosecution said that petitioner's confrontation rights were satisfied because he had the opportunity to cross-examine the expert who had testified as to the match. The prosecutor argued that Illinois Rule of Evidence 703 permitted an expert to disclose facts on which the expert's opinion is based even if the expert is not competent to testify to those underlying facts, and that any deficiency went to the weight of the evidence, not its admissibility. The trial court admitted the evidence and found petitioner guilty. Both the Illinois Court of Appeals and the State Supreme Court affirmed, concluding that Lambatos' testimony did not violate petitioner's confrontation rights because Cellmark's report was not offered into evidence to prove the truth of the matter asserted.

*Held:* The judgment is affirmed.

238 Ill. 2d 125, 939 N. E. 2d 268, affirmed.

JUSTICE ALITO, joined by THE CHIEF JUSTICE, JUSTICE KENNEDY, and JUSTICE BREYER, concluded that the form of expert testimony given in this case does not violate the Confrontation Clause. Pp. 10–33.

(a) Before *Crawford* v. *Washington*, 541 U. S. 36, this Court took the view that the Confrontation Clause did not bar the admission of out-of-court statements that fell within a firmly rooted exception to the hearsay rule. In *Crawford,* the Court held that such statements could be "admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Id.*, at 59. In both *Melendez-Diaz* v. *Massachusetts*, 557 U. S. 305, and *Bullcoming* v. *New Mexico*, 564 U. S. ___, two of the many cases that have arisen from *Crawford,* this Court ruled that scientific reports could not be used as substantive evidence against a defendant unless the analyst who prepared and certified the report was subject to confrontation. In each case, the report at issue "contain[ed] a testimonial certification, made in order to prove a fact at a criminal trial." 564 U. S., at ___–___. Here, in contrast, the question is the constitutionality of allowing an expert witness to discuss others' testimonial statements if those statements are not themselves admitted as evidence. Pp. 10–13.

(b) An expert witness may voice an opinion based on facts concerning the events at issue even if the expert lacks first-hand knowledge of those facts. A long tradition in American courts permits an expert to testify in the form of a "hypothetical question," where the expert assumes the truth of factual predicates and then offers testimony based on those assumptions. See *Forsyth* v. *Doolittle*, 120 U. S. 73, 77. Modern evidence rules dispense with the need for hypothetical questions and permit an expert to base an opinion on facts "made known to the expert at or before the hearing," though such reliance does not constitute admissible evidence of the underlying information. Ill. Rule Evid. 703; Fed. Rule Evid. 703. Both Illinois and Federal Rules bar an expert from disclosing the inadmissible evidence in jury trials but not in bench trials. This is important because *Crawford,* while departing from prior Confrontation Clause precedent in other respects, reaffirmed the proposition that the Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." 541 U. S., at 59, n. 9. Pp. 13–16.

(c) For Confrontation Clause purposes, the references to Cellmark in the trial record either were not hearsay or were not offered for the truth of the matter asserted. Pp. 16–27.

(1) Petitioner's confrontation right was not violated when Lambatos answered "yes" to a question about whether there was a match between the DNA profile "found in semen from the vaginal swabs of [L. J.]" and the one identified as petitioner's. Under Illinois law, this putatively offending phrase was not admissible for the purpose of proving the truth of the matter asserted—*i.e.,* that the matching

DNA profile was "found in semen from the vaginal swabs." Rather, that fact was a mere premise of the prosecutor's question, and Lambatos simply assumed it to be true in giving her answer. Because this was a bench trial, the Court assumes that the trial judge understood that the testimony was not admissible to prove the truth of the matter asserted. It is also unlikely that the judge took the testimony as providing chain-of-custody evidence. The record does not support such an understanding; no trial judge is likely to be so confused; and the admissible evidence left little room for argument that Cellmark's sample came from any source but L. J.'s swabs, since the profile matched the very man she identified in a lineup and at trial as her attacker. Pp. 16–21.

(2) Nor did the substance of Cellmark's report need to be introduced in order to show that Cellmark's profile was based on the semen in L. J.'s swabs or that its procedures were reliable. The issue here is whether petitioner's confrontation right was violated, not whether the State offered sufficient foundational evidence to support the admission of Lambatos' opinion. If there were no proof that Cellmark's profile was accurate, Lambatos' testimony would be irrelevant, but the Confrontation Clause bars not the admission of irrelevant evidence, but the admission of testimonial statements by declarants who are not subject to cross-examination. Here, the trial record does not lack admissible evidence with respect to the source of the sample tested by Cellmark or the reliability of its profile. The State offered conventional chain-of-custody evidence, and the match between Cellmark's profile and petitioner's was telling confirmation that Cellmark's profile was deduced from the semen on L. J.'s swabs. The match also provided strong circumstantial evidence about the reliability of Cellmark's work. Pp. 21–25.

(3) This conclusion is consistent with *Bullcoming* and *Melendez-Diaz,* where forensic reports were introduced for the purpose of proving the truth of what they asserted. In contrast, Cellmark's report was considered for the limited purpose of seeing whether it matched something else, and the relevance of that match was established by independent circumstantial evidence showing that the report was based on a sample from the crime scene. There are at least four safeguards to prevent abuses in such situations. First, trial courts can screen out experts who would act as conduits for hearsay by strictly enforcing the requirement that experts display genuine "scientific, technical, or other specialized knowledge" to help the trier of fact understand the evidence or determine a fact at issue. Fed. Rule Evid. 702(a). Second, experts are generally precluded from disclosing inadmissible evidence to a jury. Third, if such evidence is disclosed, a trial judge may instruct the jury that the statements cannot be ac-

cepted for their truth, and that an expert's opinion is only as good as the independent evidence establishing its underlying premises. Fourth, if the prosecution cannot muster independent admissible evidence to prove foundational facts, the expert's testimony cannot be given weight by the trier of fact. Pp. 25–27.

(e) Even if Cellmark's report had been introduced for its truth, there would have been no Confrontation Clause violation. The Clause refers to testimony by "witnesses against" an accused, prohibiting modern-day practices that are tantamount to the abuses that gave rise to the confrontation right, namely, (a) out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct, and (b) formalized statements such as affidavits, depositions, prior testimony, or confessions. These characteristics were present in every post-*Crawford* case in which a Confrontation Clause violation has been found, except for *Hammon* v. *Indiana,* 547 U. S. 813. But, even in *Hammon,* the particular statement, elicited during police interrogation, had the primary purpose of accusing a targeted individual. A person who makes a statement to resolve an ongoing emergency is not like a trial witness because the declarant's purpose is to bring an end to an ongoing threat. *Michigan* v. *Bryant,* 562 U. S. ___, ___. Such a statement's admissibility "is the concern of . . . rules of evidence, not the Confrontation Clause. " *Id.,* ___–___ . The forensic reports in *Melendez-Diaz* and *Bullcoming* ran afoul of the Confrontation Clause because they were the equivalent of affidavits made for the purpose of proving a particular criminal defendant's guilt. But the Cellmark report's primary purpose was to catch a dangerous rapist who was still at large, not to obtain evidence for use against petitioner, who was neither in custody nor under suspicion at that time. Nor could anyone at Cellmark possibly know that the profile would inculpate petitioner. There was thus no "prospect of fabrication" and no incentive to produce anything other than a scientifically sound and reliable profile. *Bryant, supra,* at ___, ___. Lab technicians producing a DNA profile generally have no way of knowing whether it will turn out to be incriminating, exonerating, or both. And with numerous technicians working on a profile, it is likely that each technician's sole purpose is to perform a task in accordance with accepted procedures. The knowledge that defects in a DNA profile may be detected from the profile itself provides a further safeguard. Pp. 28–33.

JUSTICE THOMAS concluded that the disclosure of Cellmark's out-of-court statements through Lambatos' expert testimony did not violate the Confrontation Clause solely because Cellmark's statements lacked the requisite "formality and solemnity" to be considered " 'testimonial,' " see *Michigan* v. *Bryant,* 562 U. S. ___, ___ (THOMAS, J.,

concurring in judgment). Pp. 1–16.

(a) There was no plausible reason for the introduction of Cellmark's statements other than to establish their truth. Pp. 1–8.

(1) Illinois Rule of Evidence 703 permits an expert to base his opinion on facts about which he lacks personal knowledge and to disclose those facts to the trier of fact. Under Illinois law, such facts are not admitted for their truth, but only to explain the basis of the expert's opinion. See *People* v. *Pasch,* 152 Ill. 2d 133. But state evidence rules do not trump a defendant's constitutional right to confrontation. This Court ensures that an out-of-court statement was introduced for a "legitimate, nonhearsay purpose" before relying on the not-for-its-truth rationale to dismiss the Confrontation Clause's application. See *Tennessee* v. *Street*, 471 U. S. 409, 417. Statements introduced to explain the basis of an expert's opinion are not introduced for a plausible nonhearsay purpose because, to use the basis testimony in evaluating the expert's opinion, the factfinder must consider the truth of the basis testimony. This commonsense conclusion is not undermined by any historical practice exempting expert basis testimony from the rigors of the Confrontation Clause. Before the Federal Rules of Evidence were adopted in 1975, an expert could render an opinion based only on facts that the expert had personally perceived or learned at trial. In 1975, that universe of facts was expanded to include facts that the expert learned out of court by means other than his own perception. The disclosure of such facts raises Confrontation Clause concerns. Pp. 2–5.

(2) Those concerns are fully applicable here. In concluding that petitioner's DNA profile matched the profile derived from L. J.'s swabs, Lambatos relied on Cellmark's out-of-court statements that its profile was in fact derived from those swabs, rather than from some other source. Thus, the validity of Lambatos' opinion ultimately turned on the truth of Cellmark's statements. Pp. 5–7.

(b) These statements, however, were not "testimonial" for purposes of the Confrontation Clause, which "applies to 'witnesses' against the accused—in other words, those who 'bear testimony.'" *Crawford* v. *Washington*, 541 U. S. 36, 51. " 'Testimony,'" in turn, is " '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Ibid.* In light of its text, the Confrontation Clause regulates only the use of statements bearing "indicia of solemnity." *Davis* v. *Washington,* 547 U. S. 813, 836–837, 840 (opinion of THOMAS, J.). This test comports with history because solemnity marked the practices that the Confrontation Clause was designed to eliminate, namely, the *ex parte* examination of witnesses under English bail and committal statutes. See *id.,* at 835. Accordingly, the Clause reaches "formalized testimonial materials," such as deposi-

tions, affidavits, and prior testimony, or statements resulting from "formalized dialogue," such as custodial interrogation. *Bryant, supra,* at ___. Applying these principles, Cellmark's report is not a statement by a "witnes[s]" under the Confrontation Clause. It lacks the solemnity of an affidavit or deposition, for it is neither a sworn nor a certified declaration of fact. And, although it was produced at the request of law enforcement, it was not the product of formalized dialogue resembling custodial interrogation. *Melendez-Diaz,* 557 U. S. 305, and *Bullcoming* v. *New Mexico,* 564 U. S. ___, distinguished. Pp. 8–15.

ALITO, J., announced the judgment of the Court and delivered an opinion, in which ROBERTS, C. J., and KENNEDY and BREYER, JJ., joined. BREYER, J., filed a concurring opinion. THOMAS, J., filed an opinion concurring in the judgment. KAGAN, J., filed a dissenting opinion, in which SCALIA, GINSBURG, and SOTOMAYOR, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 10–8505

## SANDY WILLIAMS, PETITIONER *v.* ILLINOIS

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF ILLINOIS

[June 18, 2012]

JUSTICE ALITO announced the judgment of the Court and delivered an opinion, in which THE CHIEF JUSTICE, JUSTICE KENNEDY, and JUSTICE BREYER join.

In this case, we decide whether *Crawford* v. *Washington*, 541 U. S. 36, 50 (2004), precludes an expert witness from testifying in a manner that has long been allowed under the law of evidence. Specifically, does *Crawford* bar an expert from expressing an opinion based on facts about a case that have been made known to the expert but about which the expert is not competent to testify? We also decide whether *Crawford* substantially impedes the ability of prosecutors to introduce DNA evidence and thus may effectively relegate the prosecution in some cases to reliance on older, less reliable forms of proof.

In petitioner's bench trial for rape, the prosecution called an expert who testified that a DNA profile produced by an outside laboratory, Cellmark, matched a profile produced by the state police lab using a sample of petitioner's blood. On direct examination, the expert testified that Cellmark was an accredited laboratory and that Cellmark provided the police with a DNA profile. The expert also explained the notations on documents admit-

ted as business records, stating that, according to the records, vaginal swabs taken from the victim were sent to and received back from Cellmark. The expert made no other statement that was offered for the purpose of identifying the sample of biological material used in deriving the profile or for the purpose of establishing how Cellmark handled or tested the sample. Nor did the expert vouch for the accuracy of the profile that Cellmark produced. Nevertheless, petitioner contends that the expert's testimony violated the Confrontation Clause as interpreted in *Crawford*.

Petitioner's main argument is that the expert went astray when she referred to the DNA profile provided by Cellmark as having been produced from semen found on the victim's vaginal swabs. But both the Illinois Appellate Court and the Illinois Supreme Court found that this statement was not admitted for the truth of the matter asserted, and it is settled that the Confrontation Clause does not bar the admission of such statements. See *id.,* at 59–60, n. 9 (citing *Tennessee* v. *Street*, 471 U. S. 409 (1985)). For more than 200 years, the law of evidence has permitted the sort of testimony that was given by the expert in this case. Under settled evidence law, an expert may express an opinion that is based on facts that the expert assumes, but does not know, to be true. It is then up to the party who calls the expert to introduce other evidence establishing the facts assumed by the expert. While it was once the practice for an expert who based an opinion on assumed facts to testify in the form of an answer to a hypothetical question, modern practice does not demand this formality and, in appropriate cases, permits an expert to explain the facts on which his or her opinion is based without testifying to the truth of those facts. See Fed. Rule Evid. 703. That is precisely what occurred in this case, and we should not lightly "swee[p] away an accepted rule governing the admission of scientific evi-

dence." *Melendez-Diaz* v. *Massachusetts*, 557 U. S. 305, 330 (2009) (KENNEDY, J., dissenting).

We now conclude that this form of expert testimony does not violate the Confrontation Clause because that provision has no application to out-of-court statements that are not offered to prove the truth of the matter asserted. When an expert testifies for the prosecution in a criminal case, the defendant has the opportunity to cross-examine the expert about any statements that are offered for their truth. Out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause. Applying this rule to the present case, we conclude that the expert's testimony did not violate the Sixth Amendment.

As a second, independent basis for our decision, we also conclude that even if the report produced by Cellmark had been admitted into evidence, there would have been no Confrontation Clause violation. The Cellmark report is very different from the sort of extrajudicial statements, such as affidavits, depositions, prior testimony, and confessions, that the Confrontation Clause was originally understood to reach. The report was produced before any suspect was identified. The report was sought not for the purpose of obtaining evidence to be used against petitioner, who was not even under suspicion at the time, but for the purpose of finding a rapist who was on the loose. And the profile that Cellmark provided was not inherently inculpatory. On the contrary, a DNA profile is evidence that tends to exculpate all but one of the more than 7 billion people in the world today. The use of DNA evidence to exonerate persons who have been wrongfully accused or convicted is well known. If DNA profiles could not be introduced without calling the technicians who participated in the preparation of the profile, economic

pressures would encourage prosecutors to forgo DNA testing and rely instead on older forms of evidence, such as eyewitness identification, that are less reliable. See *Perry* v. *New Hampshire*, 565 U. S. ___ (2012). The Confrontation Clause does not mandate such an undesirable development. This conclusion will not prejudice any defendant who really wishes to probe the reliability of the DNA testing done in a particular case because those who participated in the testing may always be subpoenaed by the defense and questioned at trial.

I

A

On February 10, 2000, in Chicago, Illinois, a young woman, L. J., was abducted while she was walking home from work. The perpetrator forced her into his car and raped her, then robbed her of her money and other personal items and pushed her out into the street. L. J. ran home and reported the attack to her mother, who called the police. An ambulance took L. J. to the hospital, where doctors treated her wounds and took a blood sample and vaginal swabs for a sexual-assault kit. A Chicago Police detective collected the kit, labeled it with an inventory number, and sent it under seal to the Illinois State Police (ISP) lab.

At the ISP lab, a forensic scientist received the sealed kit. He conducted a chemical test that confirmed the presence of semen on the vaginal swabs, and he then resealed the kit and placed it in a secure evidence freezer.

During the period in question, the ISP lab often sent biological samples to Cellmark Diagnostics Laboratory in Germantown, Maryland, for DNA testing. There was evidence that the ISP lab sent L. J.'s vaginal swabs to Cellmark for testing and that Cellmark sent back a report containing a male DNA profile produced from semen taken from those swabs. At this time, petitioner was not under

suspicion for L. J.'s rape.

Sandra Lambatos, a forensic specialist at the ISP lab, conducted a computer search to see if the Cellmark profile matched any of the entries in the state DNA database. The computer showed a match to a profile produced by the lab from a sample of petitioner's blood that had been taken after he was arrested on unrelated charges on August 3, 2000.

On April 17, 2001, the police conducted a lineup at which L. J. identified petitioner as her assailant. Petitioner was then indicted for aggravated criminal sexual assault, aggravated kidnaping, and aggravated robbery. In lieu of a jury trial, petitioner chose to be tried before a state judge.

B

Petitioner's bench trial began in April 2006. In open court, L. J. again identified petitioner as her attacker. The State also offered three expert forensic witnesses to link petitioner to the crime through his DNA. First, Brian Hapack, an ISP forensic scientist, testified that he had confirmed the presence of semen on the vaginal swabs taken from L. J. by performing an acid phosphatase test. After performing this test, he testified, he resealed the evidence and left it in a secure freezer at the ISP lab.

Second, Karen Abbinanti, a state forensic analyst, testified that she had used Polymerase Chain Reaction (PCR) and Short Tandem Repeat (STR) techniques to develop a DNA profile from a blood sample that had been drawn from petitioner after he was arrested in August 2000. She also stated that she had entered petitioner's DNA profile into the state forensic database.

Third, the State offered Sandra Lambatos as an expert witness in forensic biology and forensic DNA analysis. On direct examination, Lambatos testified about the general process of using the PCR and STR techniques to generate

DNA profiles from forensic samples such as blood and semen. She then described how these DNA profiles could be matched to an individual based on the individual's unique genetic code. In making a comparison between two DNA profiles, Lambatos stated, it is a "commonly accepted" practice within the scientific community for "one DNA expert to rely on the records of another DNA expert." App. 51. Lambatos also testified that Cellmark was an "accredited crime lab" and that, in her experience, the ISP lab routinely sent evidence samples via Federal Express to Cellmark for DNA testing in order to expedite the testing process and to "reduce [the lab's] backlog." *Id.,* at 49–50. To keep track of evidence samples and preserve the chain of custody, Lambatos stated, she and other analysts relied on sealed shipping containers and labeled shipping manifests, and she added that experts in her field regularly relied on such protocols. *Id.,* at 50–51.

Lambatos was shown shipping manifests that were admitted into evidence as business records, and she explained what they indicated, namely, that the ISP lab had sent L. J.'s vaginal swabs to Cellmark, and that Cellmark had sent them back, along with a deduced male DNA profile. *Id.,* at 52–55. The prosecutor asked Lambatos whether there was "a computer match" between "the male DNA profile found in semen from the vaginal swabs of [L. J.]" and "[the] male DNA profile that had been identified" from petitioner's blood sample. *Id.,* at 55.

The defense attorney objected to this question for "lack of foundation," arguing that the prosecution had offered "no evidence with regard to any testing that's been done to generate a DNA profile by another lab to be testified to by this witness." *Ibid.*

The prosecutor responded: "I'm not getting at what another lab did." *Id.,* at 56. Rather, she said, she was simply asking Lambatos about "her own testing based on [DNA] information" that she had received from Cellmark.

*Ibid.* The trial judge agreed, noting, "If she says she didn't do her own testing and she relied on a test of another lab and she's testifying to that, we will see what she's going to say." *Ibid.*

The prosecutor then proceeded, asking Lambatos, "Did you compare the semen that had been identified by Brian Hapack from the vaginal swabs of [L. J.] to the male DNA profile that had been identified by Karen [Abbinanti] from the blood of [petitioner]?" *Ibid.*

Lambatos answered "Yes." *Ibid.* Defense counsel lodged an objection "to the form of the question," but the trial judge overruled it. *Ibid.* Lambatos then testified that, based on her own comparison of the two DNA profiles, she "concluded that [petitioner] cannot be excluded as a possible source of the semen identified in the vaginal swabs," and that the probability of the profile's appearing in the general population was "1 in 8.7 quadrillion black, 1 in 390 quadrillion white, or 1 in 109 quadrillion Hispanic unrelated individuals." *Id.,* at 57. Asked whether she would "call this a match to [petitioner]," Lambatos answered yes, again over defense counsel's objection. *Id.,* at 58.

The Cellmark report itself was neither admitted into evidence nor shown to the factfinder. Lambatos did not quote or read from the report; nor did she identify it as the source of any of the opinions she expressed.

On cross-examination, Lambatos confirmed that she did not conduct or observe any of the testing on the vaginal swabs, and that her testimony relied on the DNA profile produced by Cellmark. *Id.,* at 59. She stated that she trusted Cellmark to do reliable work because it was an accredited lab, but she admitted she had not seen any of the calibrations or work that Cellmark had done in deducing a male DNA profile from the vaginal swabs. *Id.,* at 59–62.

Asked whether the DNA sample might have been de-

graded before Cellmark analyzed it, Lambatos answered that, while degradation was technically possible, she strongly doubted it had occurred in this case. She gave two reasons. First, the ISP lab likely would have noticed the degradation before sending the evidence off to Cellmark. Second, and more important, Lambatos also noted that the data making up the DNA profile would exhibit certain telltale signs if it had been deduced from a degraded sample: The visual representation of the DNA sequence would exhibit "specific patterns" of degradation, and she "didn't see any evidence" of that from looking at the profile that Cellmark produced. *Id.,* at 81–82.

When Lambatos finished testifying, the defense moved to exclude her testimony "with regards to testing done by [Cellmark]" based on the Confrontation Clause. *Id.,* at 90. Defense counsel argued that there was "no evidence with regards to . . . any work done by [Cellmark] to justify testimony coming into this case with regard to their analysis." *Ibid.* Thus, while defense counsel objected to and sought the exclusion of Lambatos' testimony insofar as it implicated events at the Cellmark lab, defense counsel did not object to or move for the exclusion of any other portion of Lambatos' testimony, including statements regarding the contents of the shipment sent to or received back from Cellmark. See *id.,* at 55, 56, 90. See also 385 Ill. App. 3d 359, 367–368, 895 N. E. 2d 961, 968 (2008) (chain-of-custody argument based on shipping manifests waived).

The prosecution responded that petitioner's Confrontation Clause rights were satisfied because he had the opportunity to cross-examine the expert who had testified that there was a match between the DNA profiles produced by Cellmark and Abbinanti. App. 91. Invoking Illinois Rule of Evidence 703,[1] the prosecutor argued that

—————

[1] Consistent with the Federal Rules, Illinois Rule of Evidence 703 provides as follows:

an expert is allowed to disclose the facts on which the expert's opinion is based even if the expert is not competent to testify to those underlying facts. She further argued that any deficiency in the foundation for the expert's opinion "[d]oesn't go to the admissibility of [that] testimony," but instead "goes to the weight of the testimony." App. 91.

The trial judge agreed with the prosecution and stated that "the issue is . . . what weight do you give the test, not do you exclude it." *Id.,* at 94. Accordingly, the judge stated that he would not exclude Lambatos' testimony, which was "based on her own independent testing of the data received from [Cellmark]." *Id.,* at 94–95 (alteration in original).

The trial court found petitioner guilty of the charges against him. The state court of appeals affirmed in relevant part, concluding that Lambatos' testimony did not violate petitioner's confrontation rights because the Cellmark report was not offered into evidence to prove the truth of the matter it asserted. See 385 Ill. App. 3d, at 369, 895 N. E. 2d, at 969–970 ("Cellmark's report was not offered for the truth of the matter asserted; rather, it was offered to provide a basis for Lambatos' opinion") The Supreme Court of Illinois also affirmed. 238 Ill. 2d 125, 939 N. E. 2d 268 (2010). Under state law, the court noted, the Cellmark report could not be used as substantive evidence. When Lambatos referenced the report during her direct examination, she did so "for the limited purpose of explaining the basis for [her expert opinion]," not for the purpose of showing "the truth of the matter asserted" by

———————

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

the report. *Id.,* at 150, 939 N. E. 2d, at 282. Thus, the report was not used to establish its truth, but only "to show the underlying facts and data Lambatos used before rendering an expert opinion." *Id.,* at 145, 939 N. E. 2d, at 279.

We granted certiorari. 564 U. S. ___ (2011).

## II

### A

The Confrontation Clause of the Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." Before *Crawford*, this Court took the view that the Confrontation Clause did not bar the admission of an out-of-court statement that fell within a firmly rooted exception to the hearsay rule, see *Ohio* v. *Roberts*, 448 U. S. 56, 66 (1980), but in *Crawford,* the Court adopted a fundamentally new interpretation of the confrontation right, holding that "[t]estimonial statements of witnesses absent from trial [can be] admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." 541 U. S., at 59. *Crawford* has resulted in a steady stream of new cases in this Court. See *Bullcoming* v. *New Mexico*, 564 U. S. ___ (2011); *Michigan* v. *Bryant*, 562 U. S. ___ (2011); *Melendez-Diaz*, 557 U. S. 305; *Giles* v. *California*, 554 U. S. 353 (2008); *Indiana* v. *Edwards*, 554 U. S. 164 (2008); *Davis* v. *Washington*, 547 U. S. 813 (2006).

Two of these decisions involved scientific reports. In *Melendez-Diaz*, the defendant was arrested and charged with distributing and trafficking in cocaine. At trial, the prosecution introduced bags of a white powdery substance that had been found in the defendant's possession. The trial court also admitted into evidence three "certificates of analysis" from the state forensic laboratory stating that the bags had been "examined with the following results:

The substance was found to contain: Cocaine." 557 U. S., at 308 (internal quotation marks omitted).

The Court held that the admission of these certificates, which were executed under oath before a notary, violated the Sixth Amendment. They were created for "the sole purpose of providing evidence against a defendant," *id.,* at 323, and were "'quite plainly affidavits,'" *id.,* at 330 (THOMAS, J., concurring). The Court emphasized that the introduction of the report to prove the nature of the substance found in the defendant's possession was tantamount to "live, in-court testimony" on that critical fact and that the certificates did "precisely what a witness does on direct examination." *Id.,* at 311 (internal quotation marks omitted). There was no doubt that the certificates were used to prove the truth of the matter they asserted. Under state law, "the sole purpose of the affidavits was to provide prima facie evidence of the composition, quality, and the net weight of the analyzed substance." *Ibid.* (internal quotation marks omitted and emphasis deleted). On these facts, the Court said, it was clear that the certificates were "testimonial statements" that could not be introduced unless their authors were subjected to the "'crucible of cross-examination.'" *Id.,* at 311, 317 (quoting *Crawford, supra,* at 61).

In *Bullcoming*, we held that another scientific report could not be used as substantive evidence against the defendant unless the analyst who prepared and certified the report was subject to confrontation. The defendant in that case had been convicted of driving while intoxicated. At trial, the court admitted into evidence a forensic report certifying that a sample of the defendant's blood had an alcohol concentration of 0.21 grams per hundred milliliters, well above the legal limit. Instead of calling the analyst who signed and certified the forensic report, the prosecution called another analyst who had not performed or observed the actual analysis, but was only familiar with

the general testing procedures of the laboratory. The Court declined to accept this surrogate testimony, despite the fact that the testifying analyst was a "knowledgeable representative of the laboratory" who could "explain the lab's processes and the details of the report." 564 U. S., at ___ (KENNEDY, J., dissenting) (slip op., at 1). The Court stated simply: "The accused's right is to be confronted with the analyst who made the certification." *Id.,* at ___ (slip op., at 2).

Just as in *Melendez-Diaz*, the forensic report that was "introduce[d]" in *Bullcoming* "contain[ed] a testimonial certification, made in order to prove a fact at a criminal trial." 564 U. S., at ___–___ (slip op., at 7–8). The report was signed by the nontestifying analyst who had authored it, stating, "I certify that I followed the procedures set out on the reverse of this report, and the statements in this block are correct. The concentration of alcohol in this sample is based on the grams of alcohol in one hundred milliliters of blood." App. in *Bullcoming,* O. T. 2010, No. 09–10876, p. 62. Critically, the report was introduced at trial for the substantive purpose of proving the truth of the matter asserted by its out-of-court author—namely, that the defendant had a blood-alcohol level of 0.21. This was the central fact in question at the defendant's trial, and it was dispositive of his guilt.

In concurrence, JUSTICE SOTOMAYOR highlighted the importance of the fact that the forensic report had been admitted into evidence for the purpose of proving the truth of the matter it asserted. She emphasized that "this [was] not a case in which an expert witness was asked for his independent opinion about underlying testimonial reports that were not themselves admitted into evidence." 564 U. S., at ___ (slip op., at 6) (opinion concurring in part) (citing Fed. Rule Evid. 703). "We would face a different question," she observed, "if asked to determine the constitutionality of allowing an expert witness to discuss others'

testimonial statements if the testimonial statements were not themselves admitted as evidence." *Id.,* at \_\_\_ (slip op., at 6).

We now confront that question.

## B

It has long been accepted that an expert witness may voice an opinion based on facts concerning the events at issue in a particular case even if the expert lacks first-hand knowledge of those facts.

At common law, courts developed two ways to deal with this situation. An expert could rely on facts that had already been established in the record. But because it was not always possible to proceed in this manner, and because record evidence was often disputed, courts developed the alternative practice of allowing an expert to testify in the form of a "hypothetical question." Under this approach, the expert would be asked to assume the truth of certain factual predicates, and was then asked to offer an opinion based on those assumptions. See 1 K. Broun, McCormick on Evidence §14, p. 87 (6th ed. 2006); 1 J. Wigmore, Evidence §677, p. 1084 (2d ed. 1923) ("If the witness is skilled enough, his opinion may be adequately obtained upon hypothetical data alone; and it is immaterial whether he has ever seen the person, place or thing in question" (citation omitted)). The truth of the premises could then be established through independent evidence, and the factfinder would regard the expert's testimony to be only as credible as the premises on which it was based.

An early example of this approach comes from the English case of *Beckwith* v. *Sydebotham*, 1 Camp. 116, 170 Eng. Rep. 897 (K. B. 1807), where a party sought to prove the seaworthiness of a ship, the *Earl of Wycombe*, by calling as witnesses "several eminent surveyors of ships who had never seen the 'Earl of Wycombe.'" *Ibid.* The opposing party objected to the testimony because it relied

on facts that were not known to be true, but the judge disagreed. Because the experts were "peculiarly acquainted" with "a matter of skill or science," the judge said, the "jury might be assisted" by their hypothetical opinion based on certain assumed facts. *Id.,* at 117, 170 Eng. Rep., at 897. The judge acknowledged the danger of the jury's being unduly prejudiced by wrongly assuming the truth of the hypothetical facts, but the judge noted that the experts could be asked on cross-examination what their opinion of the ship's seaworthiness would be if different hypothetical facts were assumed. If the party that had called the experts could not independently prove the truth of the premises they posited, then the experts' "opinion might not go for much; but still it was admissible evidence." *Ibid.*

There is a long tradition of the use of hypothetical questions in American courts. In 1887, for example, this Court indicated its approval of the following jury instruction:

> "As to the questions, you must understand that they are not evidence; they are mere statements to these witnesses . . . and, upon the hypothesis or assumption of these questions the witnesses are asked to give their [opinion]. You must readily see that the value of the answers to these questions depends largely, if not wholly, upon the fact whether the statements made in these questions are sustained by the proof. If the statements in these questions are not supported by the proof, then the answers to the questions are entitled to no weight, because based upon false assumptions or statements of facts." *Forsyth* v. *Doolittle*, 120 U. S. 73, 77 (internal quotation marks omitted).

Modern rules of evidence continue to permit experts to express opinions based on facts about which they lack personal knowledge, but these rules dispense with the need for hypothetical questions. Under both the Illinois

and the Federal Rules of Evidence, an expert may base an opinion on facts that are "made known to the expert at or before the hearing," but such reliance does not constitute admissible evidence of this underlying information.   Ill. Rule Evid. 703; Fed. Rule Evid. 703.  Accordingly, *in jury trials*, both Illinois and federal law generally bar an expert from disclosing such inadmissible evidence.[2]   In bench trials, however, both the Illinois and the Federal Rules place no restriction on the revelation of such information to the factfinder.  When the judge sits as the trier of fact, it is presumed that the judge will understand the limited reason for the disclosure of the underlying inadmissible information and will not rely on that information for any improper purpose. As we have noted, "[i]n bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions."  *Harris* v. *Rivera*, 454 U. S. 339, 346 (1981) *(per curiam)*.  There is a "well-established presumption" that *the judge [has] adhered to basic rules of procedure,"* when the judge is acting as a factfinder.  *Id.,* at 346–347 (emphasis added).  See also *Gentile* v. *State Bar of Nev.,* 501 U. S. 1030, 1078 (1991) (Rehnquist, C. J., dissenting).

This feature of Illinois and federal law is important because *Crawford,* while departing from prior Confrontation Clause precedent in other respects, took pains to reaffirm the proposition that the Confrontation Clause "does not bar the use of testimonial statements for purposes

---

[2] But disclosure of these facts or data to the jury is permitted if the value of disclosure "substantially outweighs [any] prejudicial effect," Fed. Rule Evid. 703, or "the probative value . . . outweighs the risk of unfair prejudice."  People v. Pasch, 152 Ill. 2d 133, 223, 604 N. E. 2d 294, 333 (1992).  When this disclosure occurs, "the underlying facts" are revealed to the jury "for the limited purpose of explaining the basis for [the expert's] opinion" and not "for the truth of the matter asserted." Id., at 176, 604 N. E. 2d, at 311.

other than establishing the truth of the matter asserted." 541 U. S., at 59–60, n. 9 (citing *Tennessee* v. *Street*, 471 U. S. 409). In *Street*, the defendant claimed that the police had coerced him into adopting the confession of his alleged accomplice. The prosecution sought to rebut this claim by showing that the defendant's confession differed significantly from the accomplice's. Although the accomplice's confession was clearly a testimonial statement, the Court held that the jurors could hear it as long as they were instructed to consider that confession not for its truth, but only for the "distinctive and limited purpose" of comparing it to the defendant's confession, to see whether the two were identical. *Id.,* at 417.

## III

### A

In order to assess petitioner's Confrontation Clause argument, it is helpful to inventory exactly what Lambatos said on the stand about Cellmark. She testified to the truth of the following matters: Cellmark was an accredited lab, App. 49; the ISP occasionally sent forensic samples to Cellmark for DNA testing, *ibid.;* according to shipping manifests admitted into evidence, the ISP lab sent vaginal swabs taken from the victim to Cellmark and later received those swabs back from Cellmark, *id.*, at 52–55; and, finally, the Cellmark DNA profile matched a profile produced by the ISP lab from a sample of petitioner's blood, *id.*, at 55–56. Lambatos had personal knowledge of all of these matters, and therefore none of this testimony infringed petitioner's confrontation right.

Lambatos did not testify to the truth of any other matter concerning Cellmark. She made no other reference to the Cellmark report, which was not admitted into evidence and was not seen by the trier of fact. Nor did she testify to anything that was done at the Cellmark lab, and she did not vouch for the quality of Cellmark's work.

B

The principal argument advanced to show a Confrontation Clause violation concerns the phrase that Lambatos used when she referred to the DNA profile that the ISP lab received from Cellmark. This argument is developed most fully in the dissenting opinion, and therefore we refer to the dissent's discussion of this issue.

In the view of the dissent, the following is the critical portion of Lambatos' testimony, with the particular words that the dissent finds objectionable italicized:

> "Q Was there a computer match generated of the male DNA profile *found in semen from the vaginal swabs of [L.J.]* to a male DNA profile that had been identified as having originated from Sandy Williams?
>
> "A Yes, there was." *Post,* at 7 (opinion of KAGAN, J.) (quoting App. 56; emphasis added).

According to the dissent, the italicized phrase violated petitioner's confrontation right because Lambatos lacked personal knowledge that the profile produced by Cellmark was based on the vaginal swabs taken from the victim, L. J. As the dissent acknowledges, there would have been "nothing wrong with Lambatos's testifying that two DNA profiles—the one shown in the Cellmark report and the one derived from Williams's blood—matched each other; that was a straightforward application of Lambatos's expertise." *Post*, at 12. Thus, if Lambatos' testimony had been slightly modified as follows, the dissent would see no problem:

> "Q Was there a computer match generated of the male DNA profile ***produced by***

> *Cellmark* ~~found in semen from the vaginal~~
> ~~swabs of [L.J.]~~ to a male DNA profile that
> had been identified as having originated
> from Sandy Williams?
>
> "A  Yes, there was."[3]

The defect in this argument is that under Illinois law
(like federal law) it is clear that the putatively offending
phrase in Lambatos' testimony was not admissible for the
purpose of proving the truth of the matter asserted—*i.e.,*
that the matching DNA profile was "found in semen from
the vaginal swabs."  Rather, that fact was a mere premise
of the prosecutor's question, and Lambatos simply as-
sumed that premise to be true when she gave her answer
indicating that there was a match between the two DNA
profiles.  There is no reason to think that the trier of fact
took Lambatos' answer as substantive evidence to estab-
lish where the DNA profiles came from.

The dissent's argument would have force if petitioner
had elected to have a jury trial.  In that event, there would
have been a danger of the jury's taking Lambatos' testi-
mony as proof that the Cellmark profile was derived from
the sample obtained from the victim's vaginal swabs.
Absent an evaluation of the risk of juror confusion and
careful jury instructions, the testimony could not have

---

[3] The small difference between what Lambatos actually said on the
stand and the slightly revised version that the dissent would find un-
objectionable shows that, despite the dissent's rhetoric, its narrow
argument would have little practical effect in future cases.  Prosecutors
would be allowed to do exactly what the prosecution did in this case so
long as their testifying experts' testimony was slightly modified along
the lines shown above.  Following that course presumably would not
constitute a "prosecutorial dodge," "subterfuge," "indirection," the "neat
trick" of "sneak[ing]" in evidence, or the countenancing of constitutional
violations with "a wink and a nod."  See *post*, at 3, 16, 17, 12 (opinion of
KAGAN, J.).

gone to the jury.

This case, however, involves *a bench trial* and we must assume that the trial judge understood that the portion of Lambatos' testimony to which the dissent objects was not admissible to prove the truth of the matter asserted.[4] The dissent, on the other hand, reaches the truly remarkable conclusion that the wording of Lambatos' testimony confused the trial judge. Were it not for that wording, the argument goes, the judge might have found that the prosecution failed to introduce sufficient admissible evidence to show that the Cellmark profile was derived from the sample taken from the victim, and the judge might have disregarded the DNA evidence. This argument reflects a profound lack of respect for the acumen of the trial judge.[5]

To begin, the dissent's argument finds no support in the trial record. After defense counsel objected to Lambatos' testimony, the prosecutor made clear that she was asking Lambatos only about "her own testing based on [DNA] information" that she had received from Cellmark. App. 56. Recognizing that Lambatos' testimony would carry weight only if the underlying premises could be established, the judge noted that "the issue is . . . what weight do you give the test [performed by Lambatos], not do you exclude it." *Id.,* at 94. This echoes the old statement in *Beckwith* that an expert's opinion based on disputed premises "might not go for much; but still it [is] admissible evidence." 1 Camp., at 117, 170 Eng. Rep., at 897. Both

——————

[4] We do not suggest that the Confrontation Clause applies differently depending on the identity of the factfinder. Cf. *post*, at 14–15 (opinion of KAGAN, J.). Instead, our point is that the identity of the factfinder makes a big difference in evaluating the likelihood that the factfinder mistakenly based its decision on inadmissible evidence.

[5] See *post*, at 14 (opinion of KAGAN, J.) ("I do not doubt that a judge typically will do better than a jury in excluding such inadmissible evidence from his decisionmaking process. *Perhaps* the judge did so here" (emphasis added)).

the Illinois Appellate Court and the Illinois Supreme Court viewed the record in this way, and we see no ground for disagreement.[6]

Second, it is extraordinarily unlikely that any trial judge would be confused in the way that the dissent posits. That Lambatos was not competent to testify to the chain of custody of the sample taken from the victim was a point that any trial judge or attorney would immediately understand. Lambatos, after all, had absolutely nothing to do with the collection of the sample from the victim, its subsequent handling or preservation by the police in Illinois, or its shipment to and receipt by Cellmark. No trial judge would take Lambatos' testimony as furnishing "the missing link" in the State's evidence regarding the identity of the sample that Cellmark tested. See *post,* at 6 (opinion of KAGAN, J.).

Third, the admissible evidence left little room for argument that the sample tested by Cellmark came from any source other than the victim's vaginal swabs.[7] This is so

_____

[6] The dissent finds evidence of the trial judge's confusion in his statement that petitioner is " 'the guy whose DNA, *according to the evidence from the experts*, is in the semen recovered from the victim's vagina.' " *Post,* at 14 (emphasis added). The dissent interprets the phrase "according to the evidence from the experts" as a reference to what one expert, Lambatos, said about the origin of the sample that Cellmark tested. In context, however, the judge's statement is best understood as attributing to Lambatos nothing more than the conclusion that there was a match between the two DNA profiles that were compared. The foundational facts, that one of the profiles came from the defendant and that the other came from " 'the semen recovered from the victim's vagina,' " were established not by expert testimony but by ordinary chain-of-custody evidence.

[7] Our point is not that admissible evidence regarding the identity of the sample that Cellmark tested excuses the admission of testimonial hearsay on this matter. Compare *post*, at 5–6 (THOMAS, J., concurring in judgment), with *post*, at 14 (KAGAN, J., dissenting). Rather, our point is that, because there was substantial (albeit circumstantial) evidence on this matter, there is no reason to infer that the trier of fact must

because there is simply no plausible explanation for how Cellmark could have produced a DNA profile that matched Williams' if Cellmark had tested any sample other than the one taken from the victim. If any other items that might have contained Williams' DNA had been sent to Cellmark or were otherwise in Cellmark's possession, there would have been a chance of a mix-up or of cross-contamination. See *District Attorney's Office for Third Judicial Dist.* v. *Osborne,* 557 U. S. 52, 80 (2009) (ALITO, J., concurring). But there is absolutely nothing to suggest that Cellmark had any such items. Thus, the fact that the Cellmark profile matched Williams—the very man whom the victim identified in a lineup and at trial as her attacker—was itself striking confirmation that the sample that Cellmark tested was the sample taken from the victim's vaginal swabs. For these reasons, it is fanciful to suggest that the trial judge took Lambatos' testimony as providing critical chain-of-custody evidence.

C

Other than the phrase that Lambatos used in referring to the Cellmark profile, no specific passage in the trial record has been identified as violating the Confrontation Clause, but it is nevertheless suggested that the State somehow introduced "the substance of Cellmark's report into evidence." *Post,* at 8 (KAGAN, J., dissenting). The main impetus for this argument appears to be the (erroneous) view that unless the substance of the report was sneaked in, there would be insufficient evidence in the record on two critical points: first, that the Cellmark profile was based on the semen in the victim's vaginal swabs and, second, that Cellmark's procedures were reliable. This argument is both legally irrelevant for present purposes and factually incorrect.

———————

have taken Lambatos' statement as providing "the missing link."

As to legal relevance, the question before us is whether petitioner's Sixth Amendment confrontation right was violated, not whether the State offered sufficient foundational evidence to support the admission of Lambatos' opinion about the DNA match. In order to prove these underlying facts, the prosecution relied on circumstantial evidence, and the Illinois courts found that this evidence was sufficient to satisfy state-law requirements regarding proof of foundational facts. See 385 Ill. App. 3d, at 366–368, 895 N. E. 2d, at 967–968; 238 Ill. 2d, at 138, 939 N. E. 2d, at 275. We cannot review that interpretation and application of Illinois law. Thus, even if the record did not contain any evidence that could rationally support a finding that Cellmark produced a scientifically reliable DNA profile based on L. J.'s vaginal swab, that would not establish a Confrontation Clause violation. If there were no proof that Cellmark produced an accurate profile based on that sample, Lambatos' testimony regarding the match would be irrelevant, but the Confrontation Clause, as interpreted in *Crawford*, does not bar the admission of irrelevant evidence, only testimonial statements by declarants who are not subject to cross-examination.[8]

It is not correct, however, that the trial record lacks admissible evidence with respect to the source of the sample that Cellmark tested or the reliability of the Cellmark profile. As to the source of the sample, the State offered conventional chain-of-custody evidence, namely, the testimony of the physician who obtained the vaginal swabs, the testimony of the police employees who handled and kept custody of that evidence until it was sent to

―――――――
[8] Applying the Due Process Clause, we have held that a federal court may determine whether a rational trier of fact could have found the existence of all the elements needed for conviction for a state offense. *Jackson* v. *Virginia*, 443 U. S. 307, 314 (1979), but petitioner has not raised a due process claim. And in any event, L. J.'s identification of petitioner as her assailant would be sufficient to defeat any such claim.

Cellmark, and the shipping manifests, which provided evidence that the swabs were sent to Cellmark and then returned to the ISP lab. In addition, as already discussed, the match between the Cellmark profile and petitioner's profile was itself telling confirmation that the Cellmark profile was deduced from the semen on the vaginal swabs.

This match also provided strong circumstantial evidence regarding the reliability of Cellmark's work. Assuming (for the reasons discussed above) that the Cellmark profile was based on the semen on the vaginal swabs, how could shoddy or dishonest work in the Cellmark lab[9] have resulted in the production of a DNA profile that just so happened to match petitioner's? If the semen found on the vaginal swabs was not petitioner's and thus had an entirely different DNA profile, how could sloppy work in the Cellmark lab have transformed that entirely different profile into one that matched petitioner's? And without access to any other sample of petitioner's DNA (and recall that petitioner was not even under suspicion at this time), how could a dishonest lab technician have substituted petitioner's DNA profile? Under the circumstances of this case, it was surely permissible for the trier of fact to infer that the odds of any of this were exceedingly low.

This analysis reveals that much of the dissent's argument rests on a very clear error. The dissent argues that Lambatos' testimony could be "true" only if the predicate facts asserted in the Cellmark report were true, and therefore Lambatos' reference to the report must have been used for the purpose of proving the truth of those facts. See *post,* at 10–11. But the truth of Lambatos' testimony, properly understood, was not dependent on the truth of any predicate facts. Lambatos testified that two DNA profiles matched. The correctness of this expert opinion, which the defense was able to test on cross-examination,

_____

[9] See *post,* at 18 (KAGAN, J., dissenting).

was not in any way dependent on the origin of the samples
from which the profiles were derived. Of course, Lamba-
tos' opinion would have lacked probative value if the pros-
ecution had not introduced other evidence to establish the
provenance of the profiles, but that has nothing to do with
the truth of her testimony.

The dissent is similarly mistaken in its contention that
the Cellmark report "was offered for its truth because that
is all such 'basis evidence' can be offered for." *Post*, at 13;
see also *post,* at 3 (THOMAS, J., concurring in judgment)
("[S]tatements introduced to explain the basis of an expert's
opinion are not introduced for a plausible nonhearsay
purpose"). This view is directly contrary to the current
version of Rule 703 of the Federal Rules of Evidence,
which this Court approved and sent to Congress in 2000.
Under that Rule, "basis evidence" that is not admissible
for its truth may be disclosed even in a jury trial under
appropriate circumstances. The purpose for allowing this
disclosure is that it may "assis[t] the jury to evaluate
the expert's opinion." Advisory Committee's 2000 Notes on
Fed. Rule Evid. 703, 28 U. S. C. App., p. 361. The Rule
703 approach, which was controversial when adopted,[10] is
based on the idea that the disclosure of basis evidence can
help the factfinder understand the expert's thought pro-
cess and determine what weight to give to the expert's
opinion. For example, if the factfinder were to suspect
that the expert relied on factual premises with no support
in the record, or that the expert drew an unwarranted
inference from the premises on which the expert relied,
then the probativeness or credibility of the expert's opin-
ion would be seriously undermined. The purpose of dis-
closing the facts on which the expert relied is to allay
these fears—to show that the expert's reasoning was not
illogical, and that the weight of the expert's opinion does

_____

[10] See Advisory Committee's 2000 Notes on Rule 703, at 361.

not depend on factual premises unsupported by other evidence in the record—not to prove the truth of the underlying facts.

Perhaps because it cannot seriously dispute the legitimate nonhearsay purpose of illuminating the expert's thought process, the dissent resorts to the last-ditch argument that, after all, it really does not matter whether Lambatos' statement regarding the source of the Cellmark report was admitted for its truth. The dissent concedes that "the trial judge might have ignored Lambatos's statement about the Cellmark report," but nonetheless maintains that "the admission of that statement violated the Confrontation Clause even if the judge ultimately put it aside." *Post*, at 15, n. 2. But in a bench trial, it is not necessary for the judge to stop and make a formal statement on the record regarding the limited reason for which the testimony is admitted. If the judge does not consider the testimony for its truth, the effect is precisely the same. Thus, if the trial judge in this case did not rely on the statement in question for its truth, there is simply no way around the proviso in *Crawford* that the Confrontation Clause applies only to out-of-court statements that are "use[d]" to "establis[h] the truth of the matter asserted." 541 U. S., at 59–60, n. 9 (citing *Street*, 471 U. S. 409).

For all these reasons, we conclude that petitioner's Sixth Amendment confrontation right was not violated.

D

This conclusion is entirely consistent with *Bullcoming* and *Melendez-Diaz.* In those cases, the forensic reports were introduced into evidence, and there is no question that this was done for the purpose of proving the truth of what they asserted: in *Bullcoming* that the defendant's blood alcohol level exceeded the legal limit and in *Melendez-Diaz* that the substance in question contained cocaine. Nothing comparable happened here. In this case, the

Cellmark report was not introduced into evidence. An expert witness referred to the report not to prove the truth of the matter asserted in the report, *i.e.,* that the report contained an accurate profile of the perpetrator's DNA, but only to establish that the report contained a DNA profile that matched the DNA profile deduced from petitioner's blood. Thus, just as in *Street*, the report was not to be considered for its truth but only for the "distinctive and limited purpose" of seeing whether it matched something else. 471 U. S., at 417. The relevance of the match was then established by independent circumstantial evidence showing that the Cellmark report was based on a forensic sample taken from the scene of the crime.

Our conclusion will not open the door for the kind of abuses suggested by some of petitioner's *amici* and the dissent. See *post*, at 10–11; Brief for Richard D. Friedman as *Amicus Curiae* 20–21. In the hypothetical situations posited, an expert expresses an opinion based on factual premises not supported by any admissible evidence, and may also reveal the out-of-court statements on which the expert relied.[11]     There are at least four safeguards to

———————

[11] Both JUSTICE THOMAS and JUSTICE KAGAN quote statements in D. Kaye, D. Bernstein, & J. Mnookin, The New Wigmore: Expert Evidence §4.10.1, pp. 196–197 (2d ed. 2011) (hereinafter New Wigmore), that are critical of the theory that an expert, without violating the Confrontation Clause, may express an opinion that is based on testimonial hearsay and may, in some circumstances, disclose that testimonial hearsay to the trier of fact. The principal basis for this criticism seems to be the fear that juries, even if given limiting instructions, will view the disclosed hearsay as evidence of the truth of the matter asserted. See *id.*, at 196, n. 36 (referring reader to the more detailed discussion in Mnookin, Expert Evidence and the Confrontation Clause After *Crawford* v. *Washington*, 15 J. L. & Pol'y 791 (2007)); New Wigmore 197, and n. 39 (citing jury cases); Mnookin, *supra,* at 802–804, 811–813. This argument plainly has no application in a case like this one, in which a judge sits as the trier of fact. In the 2012 Supplement of The New Wigmore, the authors discuss the present case and criticize the reasoning of the Illinois courts as follows:

prevent such abuses. First, trial courts can screen out experts who would act as mere conduits for hearsay by strictly enforcing the requirement that experts display some genuine "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. Rule Evid. 702(a). Second, experts are generally precluded from disclosing inadmissible evidence to a jury. See Fed. Rule Evid. 703; *People* v. *Pasch*, 152 Ill. 2d 133, 175–176, 604 N. E. 2d 294, 310–311 (1992). Third, if such evidence is disclosed, the trial judges may and, under most circumstances, must, instruct the jury that out-of-court statements cannot be accepted for their truth, and that an expert's opinion is only as good as the independent evidence that establishes its underlying premises. See Fed. Rules Evid. 105, 703; *People* v. *Scott*, 148 Ill. 2d 479, 527–528, 594 N. E. 2d 217, 236–237 (1992). And fourth, if the prosecution cannot muster any independent admissible evidence to prove the foundational facts that are essential to the relevance of the expert's testimony, then the expert's testimony cannot be given any weight by the trier of fact.[12]

_____

"The problem with [the not-for-the-truth-of-the-matter argument accepted by the Illinois courts] is that Lambatos had to rely on the truth of the statements in the Cellmark report to reach her own conclusion. The claim that evidence that *the jury* must credit in order to credit the conclusion of the expert is introduced for something other than its truth is sheer fiction." New Wigmore §4.11.6, at 24 (2012 Supp.) (emphasis added).

This discussion is flawed. It overlooks the fact that there was no jury in this case, and as we have explained, the trier of fact did not have to rely on any testimonial hearsay in order to find that Lambatos' testimony about the DNA match was supported by adequate foundational evidence and was thus probative.

[12] Our discussion of the first ground for our decision cannot conclude without commenting on the Kocak case, which dramatically appears at the beginning of the dissent. In that case, a Cellmark lab analyst

## IV

### A

Even if the Cellmark report had been introduced for its truth, we would nevertheless conclude that there was no Confrontation Clause violation. The Confrontation Clause refers to testimony by "witnesses against" an accused. Both the noted evidence scholar James Henry Wigmore and Justice Harlan interpreted the Clause in a strictly literal sense as referring solely to persons who testify in court, but we have not adopted this narrow view. It has been said that "[t]he difficulty with the Wigmore-Harlan view in its purest form is its tension with much of the apparent history surrounding the evolution of the right of confrontation at common law." *White* v. *Illinois*, 502 U. S. 346, 360 (1992) (THOMAS, J., concurring). "[T]he principal evil at which the Confrontation Clause was directed," the Court concluded in *Crawford,* "was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused." 541 U. S., at 50. "[I]n England, pretrial examinations of suspects

_____

realized while testifying at a pretrial hearing that there was an error in the lab's report and that the DNA profile attributed to the accused was actually that of the victim. The lesson of this cautionary tale is nothing more than the truism that it is possible for an apparently incriminating DNA profile to be mistakenly attributed to an accused. But requiring that the lab analyst or analysts who produced the DNA profile be called as prosecution witnesses is neither sufficient nor necessary to prevent such errors. Since samples may be mixed up or contaminated at many points along the way from a crime scene to the lab, calling one or more lab analysts will not necessarily catch all such mistakes. For example, a mistake might be made by a clerical employee responsible for receiving shipments of samples and then providing them to the lab's technicians. What is needed is for the trier of fact to make sure that the evidence, whether direct or circumstantial, rules out the possibility of such mistakes at every step along the way. And in the usual course of authentication, defense counsel will have access to sufficient information to inquire into, question, or challenge the procedures used by a laboratory if this seems to be a prudent and productive strategy.

and witnesses by government officials 'were sometimes read in court in lieu of live testimony.'" *Bryant*, 562 U. S., at \_\_\_ (slip op., at 6) (quoting *Crawford*, *supra,* at 43). The Court has thus interpreted the Confrontation Clause as prohibiting modern-day practices that are tantamount to the abuses that gave rise to the recognition of the confrontation right. But any further expansion would strain the constitutional text.

The abuses that the Court has identified as prompting the adoption of the Confrontation Clause shared the following two characteristics: (a) they involved out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct and (b) they involved formalized statements such as affidavits, depositions, prior testimony, or confessions. In all but one of the post-*Crawford* cases[13] in which a Confrontation Clause violation has been found, both of these characteristics were present. See *Bullcoming*, 564 U. S., at 308 (slip op., at 3–4) (certified lab report having purpose of showing that defendant's blood-alcohol level exceeded legal limit); *Melendez-Diaz*, 557 U. S., at 308 (certified lab report having purpose of showing that substance connected to defendant contained cocaine); *Crawford*, *supra*, at 38 (custodial statement made after *Miranda* warnings that shifted blame from declarant to accused).[14] The one exception occurred in *Hammon* v. *Indiana*, 547 U. S. 813, 829–832 (2006), which was decided together with *Davis* v. *Washington*, but in *Hammon* and every other post-*Crawford* case in which the Court has found a violation of

––––––––

[13] Experience might yet show that the holdings in those cases should be reconsidered for the reasons, among others, expressed in the dissents the decisions produced. Those decisions are not challenged in this case and are to be deemed binding precedents, but they can and should be distinguished on the facts here.

[14] With respect to *Crawford*, see *Davis*, 547 U. S., at 840 (THOMAS, J., concurring in judgment in part and dissenting in part).

the confrontation right, the statement at issue had the primary purpose of accusing a targeted individual.

## B

In *Hammon*, the one case in which an informal state-ment was held to violate the Confrontation Clause, we considered statements elicited in the course of police in-terrogation. We held that a statement does not fall within the ambit of the Clause when it is made "under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." 547 U. S., at 822. In *Bryant*, another police-interrogation case, we explained that a person who makes a statement to resolve an ongo-ing emergency is not acting like a trial witness because the declarant's purpose is not to provide a solemn declara-tion for use at trial, but to bring an end to an ongoing threat. See 562 U. S., at ___, ___ (slip op., at 11, 14). We noted that "the prospect of fabrication . . . is presumably significantly diminished" when a statement is made under such circumstances, *id.,* at ___ (slip op., at 14) and that reliability is a salient characteristic of a statement that falls outside the reach of the Confrontation Clause, *id.,* at ___–___ (slip op., at 14–15). We emphasized that if a statement is not made for "the primary purpose of creating an out-of-court substitute for trial testimony," its admissi-bility "is the concern of state and federal rules of evidence, not the Confrontation Clause." *Id.,* at ___–___ (slip op., at 11–12).

In *Melendez-Diaz* and *Bullcoming*, the Court held that the particular forensic reports at issue qualified as testi-monial statements, but the Court did not hold that all forensic reports fall into the same category. Introduction of the reports in those cases ran afoul of the Confrontation Clause because they were the equivalent of affidavits made for the purpose of proving the guilt of a particular

criminal defendant at trial. There was nothing resembling an ongoing emergency, as the suspects in both cases had already been captured, and the tests in question were relatively simple and can generally be performed by a single analyst. In addition, the technicians who prepared the reports must have realized that their contents (which reported an elevated blood-alcohol level and the presence of an illegal drug) would be incriminating.

### C

The Cellmark report is very different. It plainly was not prepared for the primary purpose of accusing a targeted individual. In identifying the primary purpose of an out-of-court statement, we apply an objective test. *Bryant*, 562 U. S., at \_\_\_ (slip op., at 13). We look for the primary purpose that a reasonable person would have ascribed to the statement, taking into account all of the surrounding circumstances. *Ibid.*

Here, the primary purpose of the Cellmark report, viewed objectively, was not to accuse petitioner or to create evidence for use at trial. When the ISP lab sent the sample to Cellmark, its primary purpose was to catch a dangerous rapist who was still at large, not to obtain evidence for use against petitioner, who was neither in custody nor under suspicion at that time. Similarly, no one at Cellmark could have possibly known that the profile that it produced would turn out to inculpate petitioner—or for that matter, anyone else whose DNA profile was in a law enforcement database. Under these circumstances, there was no "prospect of fabrication" and no incentive to produce anything other than a scientifically sound and reliable profile. *Id.,* at \_\_\_ (slip op., at 14).

The situation in which the Cellmark technicians found themselves was by no means unique. When lab technicians are asked to work on the production of a DNA profile, they often have no idea what the consequences of

their work will be. In some cases, a DNA profile may provide powerful incriminating evidence against a person who is identified either before or after the profile is completed. But in others, the primary effect of the profile is to exonerate a suspect who has been charged or is under investigation. The technicians who prepare a DNA profile generally have no way of knowing whether it will turn out to be incriminating or exonerating—or both.

It is also significant that in many labs, numerous technicians work on each DNA profile. See Brief for New York County District Attorney's Office et al. as *Amici Curiae* 6 (New York lab uses at least 12 technicians for each case); *People* v. *Johnson*, 389 Ill. App. 3d 618, 627, 906 N. E. 2d 70, 79 (2009) ("[A]pproximately 10 Cellmark analysts were involved in the laboratory work in this case"). When the work of a lab is divided up in such a way, it is likely that the sole purpose of each technician is simply to perform his or her task in accordance with accepted procedures.

Finally, the knowledge that defects in a DNA profile may often be detected from the profile itself provides a further safeguard. In this case, for example, Lambatos testified that she would have been able to tell from the profile if the sample used by Cellmark had been degraded prior to testing. As noted above, moreover, there is no real chance that "sample contamination, sample switching, mislabeling, [or] fraud" could have led Cellmark to produce a DNA profile that falsely matched petitioner. *Post,* at 21 (KAGAN, J., dissenting). At the time of the testing, petitioner had not yet been identified as a suspect, and there is no suggestion that anyone at Cellmark had a sample of his DNA to swap in by malice or mistake. And given the complexity of the DNA molecule, it is inconceivable that shoddy lab work would somehow produce a DNA profile that just so happened to have the precise genetic makeup of petitioner, who just so happened to be picked out of a lineup by the victim. The prospect is beyond

fanciful.

In short, the use at trial of a DNA report prepared by a modern, accredited laboratory "bears little if any resemblance to the historical practices that the Confrontation Clause aimed to eliminate." *Bryant, supra,* at ___ (slip op., at 2) (THOMAS, J., concurring).

\*    \*    \*

For the two independent reasons explained above, we conclude that there was no Confrontation Clause violation in this case. Accordingly, the judgment of the Supreme Court of Illinois is

*Affirmed.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 10–8505

_____

## SANDY WILLIAMS, PETITIONER *v.* ILLINOIS

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
ILLINOIS

[June 18, 2012]

JUSTICE BREYER, concurring.

This case raises a question that I believe neither the plurality nor the dissent answers adequately: How does the Confrontation Clause apply to the panoply of crime laboratory reports and underlying technical statements written by (or otherwise made by) laboratory technicians? In this context, what, if any, are the outer limits of the "testimonial statements" rule set forth in *Crawford* v. *Washington*, 541 U. S. 36 (2004)? Because I believe the question difficult, important, and not squarely addressed either today or in our earlier opinions, and because I believe additional briefing would help us find a proper, generally applicable answer, I would set this case for reargument. In the absence of doing so, I adhere to the dissenting views set forth in *Melendez-Diaz* v. *Massachusetts*, 557 U. S. 305 (2009), and *Bullcoming* v. *New Mexico*, 564 U. S. ___ (2011). I also join the plurality's opinion.

I

A

This case is another in our series involving the intersection of the Confrontation Clause and expert testimony. Before trial, the prosecution's expert, Sandra Lambatos, received a copy of a report prepared by Cellmark Diagnostics Laboratory. That report reflected the fact that Cellmark technicians had received material from a vaginal

swab taken from the crime victim, had identified semen in that material, and had derived a profile of the male DNA that the semen contained. Lambatos then entered that profile into an Illinois State Police Crime Laboratory computerized database, which contained, among many other DNA profiles, a profile derived by the crime laboratory from Williams' blood (taken at an earlier time). The computer she was using showed that the two profiles matched. Lambatos then confirmed the match.

Later, Lambatos testified at trial, where the prosecutor asked her three relevant questions. First, the prosecutor asked whether there was "a computer match generated of the male DNA profile [derived by Cellmark] found in [the] semen from the vaginal swabs . . . to [the] male DNA profile [found in the database] that had been identified as having originated from Sandy Williams"? App. 56. Since the computer had shown such a match, Lambatos answered affirmatively. *Ibid.*

Second, the prosecutor asked whether Lambatos had independently "compare[d the DNA profile that Cellmark had derived from] the semen that had been identified . . . from the vaginal swabs of [the victim] to the male DNA profile [found in the database] that had been [derived] . . . from the blood of Sandy Williams." *Ibid.* Lambatos again answered affirmatively. *Ibid.*

Third, the prosecutor asked whether, in Lambatos' expert opinion, the DNA profile derived from the semen identified in the vaginal swabs of the victim was "a match to Sandy Williams." *Id.,* at 58. Lambatos again answered affirmatively. *Ibid.*

The Confrontation Clause problem lies in the fact that Lambatos did not have personal knowledge that the male DNA profile that Cellmark said was derived from the crime victim's vaginal swab sample was in fact correctly derived from that sample. And no Cellmark expert testified that it was true. Rather, she simply relied for her

knowledge of the fact upon Cellmark's report. And the defendant Williams had no opportunity to cross-examine the individual or individuals who produced that report.

In its first conclusion, the plurality explains why it finds that admission of Lambatos' testimony nonetheless did not violate the Confrontation Clause. That Clause concerns out-of-court statements admitted for their truth. *Ante,* at 15–16. Lambatos' testimony did not introduce the Cellmark report (which other circumstantial evidence supported) for its truth. *Ante,* at 16–21. Rather, Lambatos used the Cellmark report only to indicate the underlying factual information upon which she based her independent expert opinion. *Ibid.* Under well-established principles of evidence, experts may rely on otherwise inadmissible out-of-court statements as a basis for forming an expert opinion if they are of a kind that experts in the field normally rely upon. See Fed. Rule Evid. 703; Ill. Rule Evid. 703. Nor need the prosecution enter those out-of-court statements into evidence for their truth. That, the Illinois courts held, is just what took place here. *Ante,* at 9–10.

The dissent would abandon this well-established rule. It would not permit Lambatos to offer an expert opinion in reliance on the Cellmark report unless the prosecution also produces one or more experts who wrote or otherwise produced the report. I am willing to accept the dissent's characterization of the present rule as artificial, see *post,* at 15–17 (opinion of KAGAN, J.), but I am not certain that the dissent has produced a workable alternative, see *Bullcoming, supra,* at \_\_\_ (KENNEDY, J., dissenting) (slip op., at 7) (expressing similar view).

Once one abandons the traditional rule, there would seem often to be no logical stopping place between requiring the prosecution to call as a witness one of the laboratory experts who worked on the matter and requiring the prosecution to call *all* of the laboratory experts who did so.

Experts—especially laboratory experts—regularly rely on the technical statements and results of other experts to form their own opinions. The reality of the matter is that the introduction of a laboratory report involves layer upon layer of technical statements (express or implied) made by one expert and relied upon by another. Hence my general question: How does the Confrontation Clause apply to crime laboratory reports and underlying technical statements made by laboratory technicians?

### B

The general question is not easy to answer. The California case described at the outset of the dissenting opinion helps to illustrate the difficulty. In that example, Cellmark, the very laboratory involved in this case, tested a DNA sample taken from the crime scene. A laboratory analyst, relying upon a report the laboratory had prepared, initially stated (at a pretrial hearing about admissibility) that the laboratory had found that the crime-scene DNA sample matched a sample of the defendant's DNA. But during the hearing and after reviewing the laboratory's notes, the laboratory analyst realized that the written report was mistaken. In fact, the testing showed only that the crime-scene DNA matched a sample of the victim's DNA, not the defendant's DNA. At some point during the writing of the report, someone, perhaps the testifying analyst herself, must have misread the proper original sample labeling. Upon discovering the error, the analyst corrected her testimony.

The example is useful, not simply because as adapted it might show the importance of cross-examination (an importance no one doubts), but also because it can reveal the nature of the more general question before us. When the laboratory in the example received the DNA samples, it labeled them properly. The laboratory's final report mixed up the labels. Any one of many different techni-

cians could be responsible for an error like that. And the testifying analyst might not have reviewed the underlying notes and caught the error during direct examination (or for that matter, during cross-examination).

Adapting the example slightly, assume that the admissibility of the initial laboratory report into trial had been directly at issue. Who should the prosecution have had to call to testify? Only the analyst who signed the report noting the match? What if the analyst who made the match knew nothing about either the laboratory's underlying procedures or the specific tests run in the particular case? Should the prosecution then have had to call all potentially involved laboratory technicians to testify? Six to twelve or more technicians could have been involved. (See Appendix, *infra,* which lists typically relevant laboratory procedures.) Some or all of the words spoken or written by each technician out of court might well have constituted relevant statements offered for their truth and reasonably relied on by a supervisor or analyst writing the laboratory report. Indeed, petitioner's *amici* argue that the technicians at each stage of the process should be subject to cross-examination. See Brief for Innocence Network as *Amicus Curiae* 13–23 (hereinafter Innocence Network Brief).

And as is true of many hearsay statements that fall within any of the 20 or more hearsay exceptions, cross-examination could sometimes significantly help to elicit the truth. See Fed. Rule Evid. 803 (listing 24 hearsay exceptions). The Confrontation Clause as interpreted in *Crawford* recognizes, as a limitation upon a pure "testimonial statement" requirement, circumstances where the defendant had an adequate "prior opportunity to cross-examine." 541 U. S., at 59. To what extent might the "testimonial statements" requirement embody one or more (or modified versions) of these traditional hearsay exceptions as well?

   Lower courts and treatise writers have recognized the
problem. And they have come up with a variety of solu-
tions. The New Wigmore, for example, lists several non-
exclusive approaches to when testifying experts may rely
on testing results or reports by nontestifying experts (*i.e.,*
DNA technicians or analysts), including: (1) "the dominant
approach," which is simply to determine the need to testify
by looking "the quality of the nontestifying expert's report,
the testifying expert's involvement in the process, and the
consequent ability of the testifying expert to use inde-
pendent judgment and interpretive skill"; (2) permitting "a
substitute expert to testify about forensic science results
only when the first expert is unavailable" (irrespective of
the lack of opportunity to cross-examine the first expert,
cf. *Crawford*, *supra*, at 59); (3) permitting "a substitute
expert" to testify if "the original test was documented in a
thorough way that permits the substitute expert to evalu-
ate, assess, and interpret it"; (4) permitting a DNA analyst
to introduce DNA test results at trial without having
"personally perform[ed] every specific aspect of each DNA
test in question, provided the analyst was present during
the critical stages of the test, is familiar with the process
and the laboratory protocol involved, reviews the results
in proximity to the test, and either initials or signs the
final report outlining the results"; (5) permitting the in-
troduction of a crime laboratory DNA report without the
testimony of a technician where the "testing in its pre-
liminary stages" only "requires the technician simply to
perform largely mechanical or ministerial tasks . . . absent
some reason to believe there was error or falsification";
and (6) permitting introduction of the report without
requiring the technicians to testify where there is a show-
ing of "genuine unavailability." See D. Kaye, D. Bern-
stein, & J. Mnookin, The New Wigmore: Expert Evidence,
§§4.10.2, 4.10.3, pp. 202, 204, 206 (2d ed. 2010) (internal
quotation marks and footnote omitted); *id.*, §4.11.6, at 24

(Supp. 2012).

Some of these approaches seem more readily compatible with *Crawford* than others. Some seem more easily considered by a rules committee (or by state courts) than by this Court. Nonetheless, all assume some kind of *Crawford* boundary—some kind of limitation upon the scope of its application—though they reflect different views as to just how and when that might be done.

Answering the underlying general question just discussed, and doing so soon, is important. Trial judges in both federal and state courts apply and interpret hearsay rules as part of their daily trial work. The trial of criminal cases makes up a large portion of that work. And laboratory reports frequently constitute a portion of the evidence in ordinary criminal trials. Obviously, judges, prosecutors, and defense lawyers have to know, in as definitive a form as possible, what the Constitution requires so that they can try their cases accordingly.

The several different opinions filed today embody several serious, but different, approaches to the difficult general question. Yet none fully deals with the underlying question as to how, after *Crawford,* Confrontation Clause "testimonial statement" requirements apply to crime laboratory reports. Nor can I find a general answer in *Melendez-Diaz* or *Bullcoming.* While, as a matter of pure logic, one might use those cases to answer a narrowed version of the question presented here, see *post,* at 7–8 (KAGAN, J., dissenting), those cases do not fully consider the broader evidentiary problem presented. I consequently find the dissent's response, "Been there, done that," unsatisfactory. See *post,* at 21.

Under these circumstances, I would have this case reargued. I would request the parties and *amici* to focus specifically upon the broader "limits" question. And I would permit them to discuss, not only the possible implications of our earlier post-*Crawford* opinions, but also any

necessary modifications of statements made in the opinions of those earlier cases.

## II

In the absence of reargument, I adhere to the dissenting view set forth in *Melendez-Diaz* and *Bullcoming*, under which the Cellmark report would not be considered "testimonial" and barred by the Confrontation Clause. See also *ante*, at 28–33 (setting forth similar conclusion). That view understands the Confrontation Clause as interpreted in C*rawford* to bar the admission of "*[t]estimonial*" statements made out of court unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine. 541 U. S., at 59 (emphasis added). It also understands the word "testimonial" as having outer limits and *Crawford* as describing a constitutional heartland. And that view would leave the States with constitutional leeway to maintain traditional expert testimony rules as well as hearsay exceptions where there are strong reasons for doing so and *Crawford*'s basic rationale does not apply.

In particular, the States could create an exception that presumptively would allow introduction of DNA reports from accredited crime laboratories. The defendant would remain free to call laboratory technicians as witnesses. Were there significant reason to question a laboratory's technical competence or its neutrality, the presumptive exception would disappear, thereby requiring the prosecution to produce any relevant technical witnesses. Such an exception would lie outside *Crawford*'s constitutional limits.

Consider the report before us. Cellmark's DNA report embodies technical or professional data, observations, and judgments; the employees who contributed to the report's findings were professional analysts working on technical matters at a certified laboratory; and the employees operated behind a veil of ignorance that likely prevented them

from knowing the identity of the defendant in this case. Statements of this kind fall within a hearsay exception that has constituted an important part of the law of evidence for decades. See Fed. Rule Evid. 803(6) ("Records of Regularly Conducted Activity"); 2 J. Wigmore, Evidence §§1517–1533, pp. 1878–1899 (1904) ("Regular Entries"). And for somewhat similar reasons, I believe that such statements also presumptively fall outside the category of "testimonial" statements that the Confrontation Clause makes inadmissible.

As the plurality points out, *ante,* at 28–33, the introduction of statements of this kind does not risk creating the "principal evil at which the Confrontation Clause was directed." *Crawford*, 541 U. S., at 50. That evil consists of the pre-Constitution practice of using "*ex parte* examinations as evidence against the accused." *Ibid.* Sir Walter Raleigh's case illustrates the point. State authorities questioned Lord Cobham, the key witness against Raleigh, outside his presence. They then used those testimonial statements in court against Raleigh. And when Raleigh asked to face and to challenge his accuser, he was denied that opportunity. See *id.,* at 44.

The Confrontation Clause prohibits the use of this kind of evidence because allowing it would deprive a defendant of the ability to cross-examine the witness. *Id.*, at 61–62; *Mattox* v. *United States*, 156 U. S. 237, 242–243 (1895). That deprivation would prevent a defendant from confronting the witness. And it would thereby prevent a defendant from probing the witness' perception, memory, narration, and sincerity. See, *e.g.,* 2 K. Broun et al., McCormick on Evidence §245, p. 125 (6th ed. 2006); E. Morgan, Some Problems of Proof Under the Anglo-American System of Litigation 119–127 (1956); 30 C. Wright & K. Graham, Federal Practice and Procedure §6324, pp. 44–49 (1997); see also M. Hale, History of the Common Law of England 258 (1713) (explaining virtues of

confronting witness); 3 W. Blackstone, Commentaries on the Laws of England 373 (1768) (same). But the need for cross-examination is considerably diminished when the out-of-court statement was made by an accredited laboratory employee operating at a remove from the investigation in the ordinary course of professional work.

For one thing, as the hearsay exception itself reflects, alternative features of such situations help to guarantee its accuracy. An accredited laboratory must satisfy well-established professional guidelines that seek to ensure the scientific reliability of the laboratory's results. App. 59–60, 74, 86–87; see Brief for National District Attorneys Assn. et al. as *Amici Curiae* 25, n. 5 (hereinafter NDAA Brief) (noting that the standards date back 30 years); Giannelli, Regulating Crime Laboratories: The Impact of DNA Evidence, 15 J. L. & Pol'y 59, 72–76 (2007). For example, forensic DNA testing laboratories permitted to access the FBI's Combined DNA Index System must adhere to standards governing, among other things, the organization and management of the laboratory; education, training, and experience requirements for laboratory personnel; the laboratory's physical facilities and security measures; control of physical evidence; validation of testing methodologies; procedures for analyzing samples, including the reagents and controls that are used in the testing process; equipment calibration and maintenance; documentation of the process used to test each sample handled by the laboratory; technical and administrative review of every case file; proficiency testing of laboratory; personnel; corrective action that addresses any discrepancies in proficiency tests and casework analysis; internal and external audits of the laboratory; environmental health and safety; and outsourcing of testing to vendor laboratories. See Brief for New York County District Attorney's Office et al. as *Amici Curiae* 4, n. 4 (hereinafter NY County DAO Brief); see also App. to NY County DAO

Brief A22–A49.

These standards are not foolproof. Nor are they always properly applied. It is not difficult to find instances in which laboratory procedures have been abused. See, *e.g.,* Innocence Network Brief 6–11; App. to Brief for Public Defender Service for the District of Columbia et al. as *Amici Curiae* 1a–12a; cf. Giannelli, The Abuse of Scientific Evidence in Criminal Cases: The Need for Independent Crime Laboratories, 4 Va. J. Soc. Pol'y & L. 439 (1997). Moreover, DNA testing itself has exonerated some defendants who previously had been convicted in part upon the basis of testimony by laboratory experts. See *Melendez-Diaz* v. *Massachusetts*, 557 U. S., at 319 (citing Garrett & Neufeld, Invalid Forensic Science Testimony and Wrongful Convictions, 95 Va. L. Rev. 1 (2009)).

But if accreditation did not prevent admission of faulty evidence in some of those cases, neither did cross-examination. In the wrongful-conviction cases to which this Court has previously referred, the forensic experts all testified in court and were available for cross-examination. Sklansky, Hearsay's Last Hurrah, 2009 S. Ct. Rev. 1, 72–73 (cited study "did not identify *any* cases in which hearsay from forensic analysts contributed to the conviction of innocent defendants"); see Garrett & Neufeld, *supra,* at 10–12, 84, 89 (noting that cross-examination was rarely effective); see also Murphy, The New Forensics: Criminal Justice, False Certainty, and the Second Generation of Scientific Evidence, 95 Cal. L. Rev. 721, 785–786 (2007) (suggesting need for greater reliance upon accreditation and oversight of accredited laboratories); Sklansky, *supra*, at 74 (same). Similarly, the role of cross-examination is ambiguous in the laboratory example that the dissent describes. See *post*, at 1–2. (Apparently, the report's error came to light and was corrected after cross-examination had concluded, see Thompson, Taroni, & Aitken, Author's Response, 49 J. Forensic Sci. 1202 (2003), and in any

event all parties had received the correctly labeled underlying laboratory data, see Clarke, Commentary, *id.,* at 1201).

For another thing, the fact that the laboratory testing takes place behind a veil of ignorance makes it unlikely that a particular researcher has a defendant-related motive to behave dishonestly, say, to misrepresent a step in an analysis or otherwise to misreport testing results.  Cf. *Michigan* v. *Bryant*, 562 U. S. ___, ___ (2011) (slip op., at 14) (discussing the "prospect of fabrication" as a factor in whether the Confrontation Clause requires statements "to be subject to the crucible of cross-examination").  The laboratory here, for example, did not know whether its test results might help to incriminate a particular defendant.  *Ante,* at 32–33; cf. *Melendez-Diaz*, *supra,* at 310–311; *Bullcoming*, 564 U. S., at ___ (slip op., at 14).

Further, the statements at issue, like those of many laboratory analysts, do not easily fit within the linguistic scope of the term "testimonial statement" as we have used that term in our earlier cases.  As the plurality notes, in every post-*Crawford* case in which the Court has found a Confrontation Clause violation, the statement at issue had the primary purpose of accusing a targeted individual. *Ante,* at 29–31; see, *e.g., Davis* v. *Washington*, 547 U. S. 813, 822 (2006) ("primary purpose . . . is to establish or prove past events potentially relevant to later criminal prosecution"); *Bryant*, *supra,* at ___–___ (slip op., at 11–12) ("primary purpose of creating an out-of-court substitute for trial testimony").  The declarant was essentially an adverse witness making an accusatory, testimonial statement—implicating the core concerns of the Lord Cobham-type affidavits.  But here the DNA report sought, not to accuse petitioner, but instead to generate objectively a profile of a then-unknown suspect's DNA from the semen he left in committing the crime.  See *ante,* at 31–33.

Finally, to bar admission of the out-of-court records at

issue here could undermine, not fortify, the accuracy of factfinding at a criminal trial. Such a precedent could bar the admission of other reliable case-specific technical information such as, say, autopsy reports. Autopsies, like the DNA report in this case, are often conducted when it is not yet clear whether there is a particular suspect or whether the facts found in the autopsy will ultimately prove relevant in a criminal trial. Autopsies are typically conducted soon after death. And when, say, a victim's body has decomposed, repetition of the autopsy may not be possible. What is to happen if the medical examiner dies before trial? *E.g., State* v. *Lackey*, 280 Kan. 190, 195–196, 120 P. 3d 332, 341 (2005); see also *People* v. *Geier*, 41 Cal. 4th 555, 601–602, 161 P. 3d 104, 136–137 (2007). Is the Confrontation Clause "'effectively'" to function "'as a statute of limitations for murder'"? *Melendez-Diaz, supra,* at 335 (KENNEDY, J., dissenting) (quoting Comment, Toward a Definition of "Testimonial": How Autopsy Reports Do Not Embody the Qualities of a Testimonial Statement, 96 Cal. L. Rev. 1093, 1115 (2008)).

In general, such a holding could also increase the risk of convicting the innocent. The New York County District Attorney's Office and the New York City Office of the Chief Medical Examiner tell us that the additional cost and complexity involved in requiring live testimony from perhaps dozens of ordinary laboratory technicians who participate in the preparation of a DNA profile may well force a laboratory "to reduce the amount of DNA testing it conducts, and force prosecutors to forgo forensic DNA analysis in cases where it might be highly probative. In the absence of DNA testing, defendants might well be prosecuted solely on the basis of eyewitness testimony, the reliability of which is often questioned." NY County DAO Brief 10 (citing *United States* v. *Wade*, 388 U. S. 218, 229 (1967)); see also NDAA Brief 26 (such a holding "will also impact the innocent who may wait to be cleared from

suspicion or exonerated from mistaken conviction"). I find this plausible. But cf. Innocence Network Brief 3. An interpretation of the Clause that risks greater prosecution reliance upon less reliable evidence cannot be sound. Cf. *Maryland* v. *Craig*, 497 U. S. 836, 845 (1990) ("The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant").

Consequently, I would consider reports such as the DNA report before us presumptively to lie outside the perimeter of the Clause as established by the Court's precedents. Such a holding leaves the defendant free to call the laboratory employee as a witness if the employee is available. Moreover, should the defendant provide good reason to doubt the laboratory's competence or the validity of its accreditation, then the alternative safeguard of reliability would no longer exist and the Constitution would entitle defendant to Confrontation Clause protection. Similarly, should the defendant demonstrate the existence of a motive to falsify, then the alternative safeguard of honesty would no longer exist and the Constitution would entitle the defendant to Confrontation Clause protection. Cf. 2 Wigmore, Evidence §1527, at 1892 (in respect to the business records exception, "there must have been no motive to misrepresent"). Thus, the defendant would remain free to show the absence or inadequacy of the alternative reliability/honesty safeguards, thereby rebutting the presumption and making the Confrontation Clause applicable. No one has suggested any such problem in respect to the Cellmark Report at issue here.

Because the plurality's opinion is basically consistent with the views set forth here, I join that opinion in full.

## APPENDIX

This appendix outlines the way that a typical modern forensic laboratory conducts DNA analysis. See NY County DAO Brief 7–8; NDAA Brief 22–23; Innocence Network Brief 13–23; see also Dept. of Justice, Office of the Inspector General, The FBI DNA Laboratory: A Review of Protocol and Practice Vulnerabilities 6–14 (May 2004), online at http://www.justice.gov/oig/special/0405/final.pdf (as visited June 14, 2012, and available in Clerk of Court's case file). The DNA analysis takes place in three parts, through three different sets of laboratory experts: (1) a DNA profile is derived from the suspect's DNA sample, (2) a DNA profile is derived from the crime-scene DNA sample, and (3) an analyst compares the two profiles and makes a conclusion.

As many as six technicians may be involved in deriving the profile from the suspect's sample; as many as six more technicians may be involved in deriving the profile from the crime-scene sample; and an additional expert may then be required for the comparative analysis, for a total of about a dozen different laboratory experts. Each expert may make technical statements (express or implied) during the DNA analysis process that are in turn relied upon by other experts. The *amici* dispute how many of these experts the Confrontation Clause requires to be subject to cross-examination. Compare Innocence Network Brief 13–23 with NY County DAO Brief 7–8 and NDAA Brief 22–23. In charting the three-step process, the appendix first summarizes the laboratory procedures used to derive a DNA profile and then illustrates potential statements that technicians may make to explain their analysis.

## A. *Profile of Suspect's Sample (Summary of Lab Process)*

**1. Technician #1: Evidence Examination**
Forensics lab receives crime-scene evidence. Tech #1 examines the evidence for biological fluids/materials and tests whether the results reveal the presence of a biological sample. If present, Tech #1 takes cuttings or swabbings from evidence for DNA extraction.

**2. Technician #2: Extraction**
Tech #2 extracts DNA from cuttings or swabbings, *i.e.,* adds chemical reagents to the sample that break open the cells and free up the DNA so that it is accessible for testing.



**3. Technician #3: Quantification**
Tech #3 measures the amount of DNA that is present in the sample to ensure that there is enough DNA for testing.

**4. Technician #4: Amplification**
Tech #4 amplifies (copies) the extracted DNA using polymerase chain reaction (PCR), *i.e.,* uses a highly automated process to target, tag, and copy specific locations (loci), raising them to a detectable level.



**5. Technicians #5 and #6: Electrophoresis**
Techs #5 and #6, using a mostly automated process known as electrophoresis, run the amplified DNA through a machine that exposes the DNA to an electrical field and separates, labels, and displays each locus, creating an electropherogram, which is a visual depiction of the genetic material resembling a line graph with peaks showing the lengths of DNA strands at specified loci.



**6. Technicians #5 and #6: Report**
Techs #5 and #6 use software to determine allele calls (*i.e.,* length) and produce a report. The software measures the length of the DNA fragments produced by electrophoresis, determines the alleles that correspond to the fragments, and compiles a DNA profile for the sample. The Techs record what the allele values are at each loci analyzed, which, once compiled, constitute a DNA profile.

## B. *Profile of Crime-Scene Sample (Examples of Statements)*

**7. Technician #7: Evidence Examination**

"The crime-scene evidence was submitted in a properly sealed packaged, and I unpackaged it using the proper precautions to ensure contamination did not occur. Using the proper tests, I determined that DNA suitable for testing was present in the evidence. I used the proper procedures to take cuttings or swabbings from the evidence and to preserve them for further testing. The procedures I followed are generally accepted in the scientific community."



**8. Technician #8: Extraction**

"I used the proper procedures and added the proper chemical reagents to the sample to break open the cells to free up the DNA so that it became accessible for further testing. I followed the proper precautions to ensure contamination did not occur. The procedures I followed are generally accepted in the scientific community."

**9. Technician #9: Quantification**

"I conducted a proper PCR process, placing the sample in the proper equipment, running the proper number of cycles, and using the proper chemical reagents to trigger the reactions that copy the DNA. I followed the proper precautions to guard against contamination. The procedures I followed are generally accepted in the scientific community."

**10. Technician #10: Amplification**

"Using the proper procedures, I used the proper chemicals to measure the amount of DNA in the sample accurately and to normalize the sample to the proper concentration. The procedures I followed are generally accepted in the scientific community."



*(Continued)*

*(Continued)*



| **11. Technicians #11 and #12: Electrophoresis** | **12. Technicians #11 and #12: Report** |
|---|---|
| "We conducted a proper electrophoresis, using the proper procedures to place the DNA in the properly calibrated equipment run in the proper conditions. We followed the proper precautions to avoid cross-sample contamination. The procedures we followed used are generally accepted in the scientific community." | "Using the proper computer software, we properly transcribed the data produced by the electropherogram into a report. We applied the proper criteria to review the computer determinations of what the allele values are at each of the chromosomal locations analyzed. We properly documented those allele values to produce the DNA profile. The procedures we followed are generally accepted in the scientific community." |

## C. Comparison Between the Two DNA Profiles

| **13. Analyst** |
|---|
| Analyst (who eventually testifies in court) compares the two electropherograms and reports, *i.e.,* compares the electropherograms and profiles from the crime-scene DNA to the defendant's DNA. Analyst then prepares her own report setting forth her conclusions about the DNA match. |

# SUPREME COURT OF THE UNITED STATES

_____

No. 10–8505

_____

## SANDY WILLIAMS, PETITIONER *v.* ILLINOIS

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
ILLINOIS

[June 18, 2012]

JUSTICE THOMAS, concurring in the judgment.

I agree with the plurality that the disclosure of
Cellmark's out-of-court statements through the expert
testimony of Sandra Lambatos did not violate the Con-
frontation Clause. I reach this conclusion, however, solely
because Cellmark's statements lacked the requisite "for-
mality and solemnity" to be considered "'testimonial'" for
purposes of the Confrontation Clause. See *Michigan* v.
*Bryant,* 562 U. S. ___, ___ (2011) (THOMAS, J., concurring
in judgment) (slip op., at 1). As I explain below, I share
the dissent's view of the plurality's flawed analysis.

I

The threshold question in this case is whether Cell-
mark's statements were hearsay at all. As the Court
has explained, "[t]he [Confrontation] Clause . . . does not
bar the use of testimonial statements for purposes other
than establishing the truth of the matter asserted." See
*Crawford* v. *Washington,* 541 U. S. 36, 60, n. 9 (2004)
(citing *Tennessee* v. *Street,* 471 U. S. 409, 414 (1985)).
Here, the State of Illinois contends that Cellmark's state-
ments—that it successfully derived a male DNA profile
and that the profile came from L. J.'s swabs—were intro-
duced only to show the basis of Lambatos' opinion, and not
for their truth. In my view, however, there was no plau-
sible reason for the introduction of Cellmark's statements

other than to establish their truth.

## A

Illinois Rule of Evidence 703 (2011) and its federal counterpart permit an expert to base his opinion on facts about which he lacks personal knowledge and to disclose those facts to the trier of fact. Relying on these Rules, the State contends that the facts on which an expert's opinion relies are not to be considered for their truth, but only to explain the basis of his opinion. See *People* v. *Pasch,* 152 Ill. 2d 133, 176, 604 N. E. 2d 294, 311 (1992) ("By allowing an expert to reveal the information for this purpose alone, it will undoubtedly aid the jury in assessing the value of his opinion"); see also Advisory Committee's Notes on Fed. Rule Evid. 703, 28 U. S. C. App., p. 361 (stating that expert basis testimony is admissible "only for the purpose of assisting the jury in evaluating an expert's opinion"). Accordingly, in the State's view, the disclosure of expert "basis testimony" does not implicate the Confrontation Clause.

I do not think that rules of evidence should so easily trump a defendant's confrontation right. To be sure, we should not "lightly swee[p] away an accepted rule" of federal or state evidence law, *ante,* at 2 (internal quotation marks omitted), when applying the Confrontation Clause. "Rules of limited admissibility are commonplace in evidence law." Mnookin, Expert Evidence and the Confrontation Clause after *Crawford v. Washington,* 15 J. L. & Pol'y 791, 812 (2007). And, we often presume that courts and juries follow limiting instructions. See, *e.g., Street*, *supra,* at 415, n. 6. But we have recognized that concepts central to the application of the Confrontation Clause are ultimately matters of federal constitutional law that are not dictated by state or federal evidentiary rules. See *Barber* v. *Page*, 390 U. S. 719, 724–725 (1968) (defining a constitutional standard for whether a witness is "unavailable"

for purposes of the Confrontation Clause); see also *Ohio* v. *Roberts*, 448 U. S. 56, 76 (1980) (recognizing that *Barber* "explored the issue of *constitutional* unavailability" (emphasis added)). Likewise, we have held that limiting instructions may be insufficient in some circumstances to protect against violations of the Confrontation Clause. See *Bruton* v. *United States*, 391 U. S. 123 (1968).

Of particular importance here, we have made sure that an out-of-court statement was introduced for a "*legitimate*, nonhearsay purpose" before relying on the not-for-its-truth rationale to dismiss the application of the Confrontation Clause. See *Street,* 471 U. S., at 417 (emphasis added). In *Street*, the defendant testified that he gave a false confession because police coerced him into parroting his accomplice's confession. *Id.,* at 411. On rebuttal, the prosecution introduced the accomplice's confession to demonstrate to the jury the ways in which the two confessions differed. *Id.,* at 411–412. Finding no Confrontation Clause problem, this Court held that the accomplice's out-of-court confession was not introduced for its truth, but only to impeach the defendant's version of events. *Id.,* at 413–414. Although the Court noted that the confession was not hearsay "under traditional rules of evidence," *id.,* at 413, the Court did not accept that nonhearsay label at face value. Instead, the Court thoroughly examined the use of the out-of-court confession and the efficacy of a limiting instruction before concluding that the Confrontation Clause was satisfied "[i]n this context." *Id.,* at 417.

Unlike the confession in *Street,* statements introduced to explain the basis of an expert's opinion are not introduced for a plausible nonhearsay purpose. There is no meaningful distinction between disclosing an out-of-court statement so that the factfinder may evaluate the expert's opinion and disclosing that statement for its truth. "To use the inadmissible information in evaluating the expert's testimony, the jury must make a preliminary judg-

ment about whether this information is true." D. Kaye, D. Bernstein, & J. Mnookin, The New Wigmore: A Treatise on Evidence: Expert Evidence §4.10.1, p. 196 (2d ed. 2011) (hereinafter Kaye). "If the jury believes that the basis evidence is true, it will likely also believe that the expert's reliance is justified; inversely, if the jury doubts the accuracy or validity of the basis evidence, it will be skeptical of the expert's conclusions." *Ibid.*[1]

Contrary to the plurality's suggestion, this common-sense conclusion is not undermined by any longstanding historical practice exempting expert basis testimony from the rigors of the Confrontation Clause. Prior to the adoption of the Federal Rules of Evidence in 1975, an expert could render an opinion based only on facts that the expert had personally perceived or facts that the expert learned at trial, either by listening to the testimony of other witnesses or through a hypothetical question based on facts in evidence. See Advisory Committee's Notes on Fed. Rule Evid. 703, 28 U. S. C. App., p. 361; 29 C. Wright & V. Gold, Federal Practice and Procedure §6271, pp. 300–301 (1997) (hereinafter Wright); 1 K. Broun et al., McCormick on Evidence §14, p. 86 (6th ed. 2006) (hereinafter Broun); Kaye §4.6, at 156–157. In those situations, there was little danger that the expert would rely on testimonial hearsay that was not subject to confrontation because the expert and the witnesses on whom he relied were present at trial. It was not until 1975 that the uni-

---

[1] The plurality relies heavily on the fact that this case involved a bench trial, emphasizing that a judge sitting as factfinder is presumed—more so than a jury—to "understand the limited reason for the disclosure" of basis testimony and to "not rely on that information for any improper purpose." *Ante,* at 15. Even accepting that presumption, the point is not that the factfinder is unable to understand the restricted purpose for basis testimony. Instead, the point is that the purportedly "limited reason" for such testimony—to aid the factfinder in evaluating the expert's opinion—necessarily entails an evaluation of whether the basis testimony is true.

verse of facts upon which an expert could rely was expanded to include facts of the case that the expert learned out of court by means other than his own perception.  1 Broun §14, at 87; Kaye §4.6, at 157.  It is the expert's disclosure of those facts that raises Confrontation Clause concerns.[2]

### B

Those concerns are fully applicable in this case.  Lambatos opined that petitioner's DNA profile matched the male profile derived from L. J.'s vaginal swabs.  In reaching that conclusion, Lambatos relied on Cellmark's out-of-court statements that the profile it reported was in fact derived from L. J.'s swabs, rather than from some other source.  Thus, the validity of Lambatos' opinion ultimately turned on the truth of Cellmark's statements.  The plurality's assertion that Cellmark's statements were merely relayed to explain "the assumptions on which [Lambatos'] opinion rest[ed]," *ante,* at 3, overlooks that the value of Lambatos' testimony depended on the truth of those very assumptions.[3]

———————

[2] In its discussion of history, the plurality relies on *Beckwith* v. *Sydebotham,* 1 Camp. 116, 170 Eng. Rep. 897 (K. B. 1807).  In that case, experts were asked to render opinions on a ship's seaworthiness based on facts read into court from the sworn *ex parte* deposition of a witness who purported to have seen the ship's deficiencies.  To be sure, *Beckwith* involved expert reliance on testimonial hearsay.  But *Beckwith* was an English case decided after the ratification of the Confrontation Clause, and this form of expert testimony does not appear to have been a common feature of early American evidentiary practice.  See 29 Wright §6271, at 300–301; 1 Broun §14, at 86–87; Kaye §4.6, at 156–157.

[3] Cellmark's statements were not introduced for the nonhearsay purpose of showing their effect on Lambatos—*i.e.,* to explain what prompted her to search the DNA database for a match.  See, *e.g.,* 30B M. Graham, Federal Practice and Procedure §7034.1, pp. 521–529 (interim ed. 2011) (noting that out-of-court statements introduced for their effect on listener do not implicate the Confrontation Clause).  The statements

It is no answer to say that *other* nonhearsay evidence established the basis of the expert's opinion.  Here, Lambatos disclosed Cellmark's statements that it generated a male DNA profile from L. J.'s swabs, but other evidence showed that L. J.'s swabs contained semen and that the swabs were shipped to and received from Cellmark.  *Ante,* at 5–6.  That evidence did not render Cellmark's statements superfluous.  Of course, evidence that Cellmark received L. J.'s swabs and later produced a DNA profile is some indication that Cellmark in fact generated the profile from those swabs, rather than from some other source (or from no source at all).  Cf. *Melendez-Diaz* v. *Massachusetts,* 557 U. S. 305, 319 (2009) (citing brief that describes "cases of documented 'drylabbing' where forensic analysts report results of tests that were never performed," including DNA tests).  But the only direct evidence to that effect was Cellmark's statement, which Lambatos relayed to the factfinder.  In any event, the factfinder's ability to rely on other evidence to evaluate an expert's opinion does not alter the conclusion that basis testimony is admitted for its truth.  The existence of other evidence corroborating the basis testimony may render any Confrontation Clause violation harmless, but it does not change the purpose of such testimony and thereby place it outside of the reach of the Confrontation Clause.[4]  I would thus conclude that

————————

that Lambatos conveyed went well beyond what was necessary to explain why she performed the search.  Lambatos did not merely disclose that she received a DNA profile from Cellmark.  Rather, she further disclosed Cellmark's statements that the profile was "male" and that it was "found in semen from the vaginal swabs of [L. J.]." App. 56. Those facts had nothing to do with her decision to conduct a search. They were introduced for their truth.

[4]The plurality concludes that the Confrontation Clause would not be implicated here "even if the record did not contain any [other] evidence that could rationally support a finding that Cellmark produced a scientifically reliable DNA profile based on L. J.'s vaginal swab." *Ante,* at 22.  But, far from establishing a "legitimate" nonhearsay purpose for

Cellmark's statements were introduced for their truth.

## C

The plurality's contrary conclusion may seem of little consequence to those who view DNA testing and other forms of "hard science" as intrinsically reliable. But see *Melendez-Diaz*, *supra,* at 318 ("Forensic evidence is not uniquely immune from the risk of manipulation"). Today's holding, however, will reach beyond scientific evidence to ordinary out-of-court statements. For example, it is not uncommon for experts to rely on interviews with third parties in forming their opinions. See, *e.g., People* v. *Goldstein,* 6 N. Y. 3d 119, 123–124, 843 N. E. 2d 727, 729–730 (2005) (psychiatrist disclosed statements made by the defendant's acquaintances as part of the basis of her opinion that the defendant was motivated to kill by his feelings of sexual frustration).

It is no answer to say that "safeguards" in the rules of evidence will prevent the abuse of basis testimony. *Ante,* at 26. To begin with, courts may be willing to conclude that an expert is not acting as a "mere condui[t]" for hearsay, *ante,* at 27, as long as he simply provides some opinion based on that hearsay. See Brief for Respondent 18, n. 4 (collecting cases). In addition, the hearsay may be the kind of fact on which experts in a field reasonably rely. See Fed. Rule Evid. 703; *Goldstein, supra,* at 125, 843 N. E. 2d, at 731 (evidence showed that reputable psychiatrists relied upon third-party interviews in forming their

---

Cellmark's statements, *Tennessee* v. *Street,* 471 U. S. 409, 417 (1985), a complete lack of other evidence tending to prove the facts conveyed by Cellmark's statements would completely refute the not-for-its-truth rationale. The trial court, in announcing its verdict, expressly concluded that petitioner's DNA matched the "DNA . . . in the semen recovered from the victim's vagina." 4 R. JJJ151. Absent other evidence, it would have been impossible for the trial court to reach that conclusion without relying on the truth of Cellmark's statement that its test results were based on the semen from L. J.'s swabs.

opinions). Of course, some courts may determine that hearsay of this sort is not substantially more probative than prejudicial and therefore should not be disclosed under Rule 703. But that balancing test is no substitute for a constitutional provision that has already struck the balance in favor of the accused. See *Crawford,* 541 U. S., at 61 ("[The Confrontation Clause] commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination").

## II

## A

Having concluded that the statements at issue here were introduced for their truth, I turn to whether they were "testimonial" for purposes of the Confrontation Clause. In *Crawford,* the Court explained that "[t]he text of the Confrontation Clause . . . applies to 'witnesses' against the accused—in other words, those who 'bear testimony.'" *Id.*, at 51 (quoting 2 N. Webster, An American Dictionary of the English Language (1828)). "'Testimony,'" in turn, is "'[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" 541 U. S., at 51. In light of its text, I continue to think that the Confrontation Clause regulates only the use of statements bearing "indicia of solemnity." *Davis* v. *Washington,* 547 U. S. 813, 836–837, 840 (2006) (THOMAS, J., concurring in judgment in part and dissenting in part). This test comports with history because solemnity marked the practices that the Confrontation Clause was designed to eliminate, namely, the *ex parte* examination of witnesses under the English bail and committal statutes passed during the reign of Queen Mary. See *id.,* at 835; *Bryant,* 562 U. S., at ___ (THOMAS, J., concurring in judgment) (slip op., at 1); *Crawford, supra,* at 43–45. Accordingly, I have concluded that the Confrontation Clause reaches

"'formalized testimonial materials,'" such as depositions, affidavits, and prior testimony, or statements resulting from "'formalized dialogue,'" such as custodial interrogation. *Bryant, supra,* at \_\_\_ (slip op., at 2); see also *Davis, supra,* at 836–837.[5]

Applying these principles, I conclude that Cellmark's report is not a statement by a "witnes[s]" within the meaning of the Confrontation Clause. The Cellmark report lacks the solemnity of an affidavit or deposition, for it is neither a sworn nor a certified declaration of fact. Nowhere does the report attest that its statements accurately reflect the DNA testing processes used or the results obtained. See Report of Laboratory Examination, Lodging of Petitioner. The report is signed by two "reviewers," but they neither purport to have performed the DNA testing nor certify the accuracy of those who did. See *ibid.* And, although the report was produced at the request of law enforcement, it was not the product of any sort of formalized dialogue resembling custodial interrogation.

The Cellmark report is distinguishable from the laboratory reports that we determined were testimonial in *Melendez-Diaz,* 557 U. S. 305, and in *Bullcoming* v. *New Mexico,* 564 U. S. \_\_\_ (2011). In *Melendez-Diaz,* the reports in question were "sworn to before a notary public by [the] analysts" who tested a substance for cocaine. 557 U. S., at 308. In *Bullcoming,* the report, though unsworn, included a "Certificate of Analyst" signed by the forensic analyst who tested the defendant's blood sample. 564 U. S., at \_\_\_ (slip op., at 3). The analyst "affirmed that

––––––––––

[5] In addition, I have stated that, because the Confrontation Clause "sought to regulate prosecutorial abuse occurring through use of *ex parte* statements," it "also reaches the use of technically informal statements when used to evade the formalized process." *Davis,* 547 U. S., at 838 (opinion concurring in judgment in part and dissenting in part). But, in this case, there is no indication that Cellmark's statements were offered "in order to evade confrontation." *Id.,* at 840.

'[t]he seal of th[e] sample was received intact and broken in the laboratory,' that 'the statements in [the analyst's block of the report] are correct,' and that he had 'followed the procedures set out on the reverse of th[e] report.'" *Ibid.*

The dissent insists that the *Bullcoming* report and Cellmark's report are equally formal, separated only by such "minutia" as the fact that Cellmark's report "is not labeled a 'certificate.'" *Post,* at 22–23 (opinion of KAGAN, J.). To the contrary, what distinguishes the two is that Cellmark's report, in substance, certifies nothing. See *supra,* at 9. That distinction is constitutionally significant because the scope of the confrontation right is properly limited to extrajudicial statements similar in solemnity to the Marian examination practices that the Confrontation Clause was designed to prevent. See *Davis, supra*, at 835–836 (opinion of THOMAS, J.). By certifying the truth of the analyst's representations, the unsworn *Bullcoming* report bore "a 'striking resemblance,'" 547 U. S., at 837 (quoting *Crawford,* 541 U. S., at 52), to the Marian practice in which magistrates examined witnesses, typically on oath, and "certif[ied] the results to the court." *Id.*, at 44. And, in *Melendez-Diaz,* we observed that "'certificates' are functionally identical to live, in-court testimony, doing precisely what a witness does on direct examination." 557 U. S., at 310–311. Cellmark's report is marked by no such indicia of solemnity.

Contrary to the dissent's suggestion, acknowledging that the Confrontation Clause is implicated only by formalized statements that are characterized by solemnity will not result in a prosecutorial conspiracy to elude confrontation by using only informal extrajudicial statements against an accused. As I have previously noted, the Confrontation Clause reaches bad-faith attempts to evade the formalized process. See *supra,* at 9, n. 5 (quoting *Davis,* 547 U. S., at 838). Moreover, the prosecution's use of

informal statements comes at a price. As the dissent recognizes, such statements are "less reliable" than formalized statements, *post,* at 24, and therefore less persuasive to the factfinder. Cf. *post,* at 21–22, n. 6 (arguing that prosecutors are unlikely to "forgo DNA evidence in favor of less reliable eyewitness testimony" simply because the defendant is entitled to confront the DNA analyst). But, even assuming that the dissent accurately predicts an upswing in the use of "less reliable" informal statements, that result does not "turn the Confrontation Clause upside down." *Post,* at 24. The Confrontation Clause does not require that evidence be reliable, *Crawford, supra*, at 61, but that the reliability of a specific "class of testimonial statements"—formalized statements bearing indicia of solemnity—be assessed through cross-examination. See *Melendez-Diaz,* 557 U. S., at 309–310.

## B

Rather than apply the foregoing principles, the plurality invokes its "primary purpose" test. The original formulation of that test asked whether the primary purpose of an extrajudicial statement was "to establish or prove past events potentially relevant to later criminal prosecution." *Davis, supra*, at 822. I agree that, for a statement to be testimonial within the meaning of the Confrontation Clause, the declarant must primarily intend to establish some fact with the understanding that his statement may be used in a criminal prosecution. See *Bryant,* 562 U. S., at ___ (SCALIA, J., dissenting) (slip op., at 2–3). But this necessary criterion is not sufficient, for it sweeps into the ambit of the Confrontation Clause statements that lack formality and solemnity and is thus "disconnected from history." *Davis, supra,* at 838–842 (opinion concurring in judgment in part and dissenting in part); *Bryant, supra*, at ___ (opinion concurring in judgment) (slip op., at 1). In addition, a primary purpose inquiry divorced from solem-

nity is unworkable in practice. *Davis, supra,* at 839; *Bryant, supra,* at ___ (slip op., at 1). Statements to police are often made *both* to resolve an ongoing emergency *and* to establish facts about a crime for potential prosecution. The primary purpose test gives courts no principled way to assign primacy to one of those purposes. *Davis, supra,* at 839. The solemnity requirement is not only true to the text and history of the Confrontation Clause, but goes a long way toward resolving that practical difficulty. If a statement bears the formality and solemnity necessary to come within the scope of the Clause, it is highly unlikely that the statement was primarily made to end an ongoing emergency.

The shortcomings of the original primary purpose test pale in comparison, however, to those plaguing the reformulated version that the plurality suggests today. The new primary purpose test asks whether an out-of-court statement has "the primary purpose of accusing a targeted individual of engaging in criminal conduct." *Ante,* at 29. That test lacks any grounding in constitutional text, in history, or in logic.

The new test first requires that an out-of-court statement be made "for the purpose of proving the guilt of a *particular* criminal defendant." *Ante,* at 30 (emphasis added). Under this formulation, statements made "before any suspect was identified" are beyond the scope of the Confrontation Clause. See *ante,* at 3. There is no textual justification, however, for limiting the confrontation right to statements made after the accused's identity became known. To be sure, the Sixth Amendment right to confrontation attaches "[i]n . . . criminal prosecutions," at which time the accused has been identified and apprehended. But the text of the Confrontation Clause does not constrain the time at which one becomes a "witnes[s]." Indeed, we have previously held that a declarant may become a "witnes[s]" before the accused's prosecution. See

*Crawford*, 541 U. S., at 50–51 (rejecting the view that the Confrontation Clause applies only to in-court testimony).

Historical practice confirms that a declarant could become a "witnes[s]" before the accused's identity was known. As previously noted, the confrontation right was a response to *ex parte* examinations of witnesses in 16th-century England. Such examinations often occurred after an accused was arrested or bound over for trial, but some examinations occurred while the accused remained "unknown or fugitive." J. Langbein, Prosecuting Crime in the Renaissance 90 (1974) (describing examples, including the deposition of a victim who was swindled out of 20 shillings by a "'cunning man'"); see also 1 J. Stephen, A History of the Criminal Law of England 217–218 (1883) (describing the sworn examinations of witnesses by coroners, who were charged with investigating suspicious deaths by asking local citizens if they knew "who [was] culpable either of the act or of the force" (internal quotation marks omitted)).

There is also little logical justification for the plurality's rule. The plurality characterizes Cellmark's report as a statement elicited by police and made by Cellmark not "to accuse petitioner or to create evidence for use at trial," but rather to resolve the ongoing emergency posed by "a dangerous rapist who was still at large." *Ante,* at 31. But, as I have explained, that distinction is unworkable in light of the mixed purposes that often underlie statements to the police. See *supra,* at 12. The difficulty is only compounded by the plurality's attempt to merge the purposes of both the police and the declarant. See *ante,* at 29; *Bryant, supra*, at \_\_\_–\_\_\_ (majority opinion) (slip op., at 20–23).

But if one purpose must prevail, here it should surely be the evidentiary one, whether viewed from the perspective of the police, Cellmark, or both. The police confirmed the presence of semen on L. J.'s vaginal swabs on February 15, 2000, placed the swabs in a freezer, and waited until

November 28, 2000, to ship them to Cellmark.  App. 30–
34, 51–52.  Cellmark, in turn, did not send its report to
the police until April 3, 2001, *id.,* at 54, over a year
after L. J.'s rape.  Given this timeline, it strains credulity
to assert that the police and Cellmark were primarily
concerned with the exigencies of an ongoing emergency,
rather than with producing evidence in the ordinary course.

In addition to requiring that an out-of-court statement
"targe[t]" a particular accused, the plurality's new primary
purpose test also considers whether the statement is so
"inherently inculpatory," *ante,* at 3, that the declarant
should have known that his statement would incriminate
the accused.  In this case, the plurality asserts that "[t]he
technicians who prepare a DNA profile generally have no
way of knowing whether it will turn out to be incriminat-
ing or exonerating—or both," *ante,* at 32, and thus "no one
at Cellmark could have possibly known that the profile
that it produced would turn out to inculpate petitioner,"
*ante,* at 31.

Again, there is no textual justification for this limitation
on the scope of the Confrontation Clause.  In *Melendez-
Diaz*, we held that "[t]he text of the [Sixth] Amendment
contemplates two classes of witnesses—those against the
defendant and those in his favor."  557 U. S., at 313–314.
We emphasized that "there is not a third category of wit-
nesses, helpful to the prosecution, but somehow immune
from confrontation."  *Id.,* at 314.  Thus, the distinction
between those who make "inherently inculpatory" state-
ments and those who make other statements that are
merely "helpful to the prosecution" has no foundation in
the text of the Amendment.

It is also contrary to history.  The 16th-century Marian
statutes instructed magistrates to transcribe any infor-
mation by witnesses that "'shall be material to prove the
felony.'"  See, *e.g.,* 1 Stephen, *supra,* at 219 (quoting 1 & 2
Phil. & Mary, ch. 13 (1554)).  Magistrates in the 17th and

18th centuries were also advised by practice manuals to take the *ex parte* examination of a witness even if his evidence was "weak" or the witness was "unable to inform any material thing against" an accused. J. Beattie, Crime and the Courts in England: 1660–1800, p. 272 (1986) (internal quotation marks omitted). Thus, neither law nor practice limited *ex parte* examinations to those witnesses who made "inherently inculpatory" statements.

This requirement also makes little sense. A statement that is not facially inculpatory may turn out to be highly probative of a defendant's guilt when considered with other evidence. Recognizing this point, we previously rejected the view that a witness is not subject to confrontation if his testimony is "inculpatory only when taken together with other evidence." *Melendez-Diaz*, *supra,* at 313. I see no justification for reviving that discredited approach, and the plurality offers none.[6]

\*    \*    \*

Respondent and its *amici* have emphasized the economic and logistical burdens that would be visited upon States should every analyst who reports DNA results be required to testify at trial. See, *e.g., ante,* at 32 (citing brief stating that some crime labs use up to 12 technicians when testing a DNA sample). These burdens are largely the product of a primary purpose test that reaches out-of-court statements well beyond the historical scope of the Confrontation Clause and thus sweeps in a broad range of sources on which modern experts regularly rely. The

———————

[6] The plurality states that its test "will not prejudice any defendant who really wishes to probe the reliability" of out-of-court statements introduced in his case because the person or persons who made the statements "may always be subpoenaed by the defense and questioned at trial." *Ante,* at 4. *Melendez-Diaz* rejected this reasoning as well, holding that the defendant's subpoena power "is no substitute for the right of confrontation." 557 U. S., at 324.

proper solution to this problem is not to carve out a Confrontation Clause exception for expert testimony that is rooted only in legal fiction. See *ante,* at 3. Nor is it to create a new primary purpose test that ensures that DNA evidence is treated differently. See *ibid.* Rather, the solution is to adopt a reading of the Confrontation Clause that respects its historically limited application to a narrow class of statements bearing indicia of solemnity. In forgoing that approach, today's decision diminishes the Confrontation Clause's protection in cases where experts convey the contents of solemn, formalized statements to explain the bases for their opinions. These are the very cases in which the accused *should* "enjoy the right . . . to be confronted with the witnesses against him."

# SUPREME COURT OF THE UNITED STATES

_____

No. 10–8505

_____

## SANDY WILLIAMS, PETITIONER *v.* ILLINOIS

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
ILLINOIS

[June 18, 2012]

JUSTICE KAGAN, with whom JUSTICE SCALIA, JUSTICE
GINSBURG, and JUSTICE SOTOMAYOR join, dissenting.

Some years ago, the State of California prosecuted a
man named John Kocak for rape. At a preliminary hear-
ing, the State presented testimony from an analyst at the
Cellmark Diagnostics Laboratory—the same facility used
to generate DNA evidence in this case. The analyst had
extracted DNA from a bloody sweatshirt found at the
crime scene and then compared it to two control samples—
one from Kocak and one from the victim. The analyst's
report identified a single match: As she explained on
direct examination, the DNA found on the sweatshirt
belonged to Kocak. But after undergoing cross-
examination, the analyst realized she had made a mortify-
ing error. She took the stand again, but this time to admit
that the report listed the victim's control sample as coming
from Kocak, and Kocak's as coming from the victim. So
the DNA on the sweatshirt matched not Kocak, but the
victim herself. See Tr. in No. SCD110465 (Super. Ct. San
Diego Cty., Cal., Nov. 17, 1995), pp. 3–4 ("I'm a little hys-
terical right now, but I think . . . the two names should be
switched"), online at http: //www.nlada.org/forensics/for_
lib/Documents/1037341561.0/JohnIvanKocak.pdf (as vis-
ited June 15, 2012, and available in Clerk of Court's case
file). In trying Kocak, the State would have to look else-
where for its evidence.

Our Constitution contains a mechanism for catching such errors—the Sixth Amendment's Confrontation Clause. That Clause, and the Court's recent cases interpreting it, require that testimony against a criminal defendant be subject to cross-examination. And that command applies with full force to forensic evidence of the kind involved in both the Kocak case and this one. In two decisions issued in the last three years, this Court held that if a prosecutor wants to introduce the results of forensic testing into evidence, he must afford the defendant an opportunity to cross-examine an analyst responsible for the test. Forensic evidence is reliable only when properly produced, and the Confrontation Clause prescribes a particular method for determining whether that has happened. The Kocak incident illustrates how the Clause is designed to work: Once confronted, the analyst discovered and disclosed the error she had made. That error would probably not have come to light if the prosecutor had merely admitted the report into evidence or asked a third party to present its findings. Hence the genius of an 18th-century device as applied to 21st-century evidence: Cross-examination of the analyst is especially likely to reveal whether vials have been switched, samples contaminated, tests incompetently run, or results inaccurately recorded.

Under our Confrontation Clause precedents, this is an open-and-shut case. The State of Illinois prosecuted Sandy Williams for rape based in part on a DNA profile created in Cellmark's laboratory. Yet the State did not give Williams a chance to question the analyst who produced that evidence. Instead, the prosecution introduced the results of Cellmark's testing through an expert witness who had no idea how they were generated. That approach—no less (perhaps more) than the confrontation-free methods of presenting forensic evidence we have formerly banned—deprived Williams of his Sixth Amendment right to "confron[t] . . . the witnesses against him."

KAGAN, J., dissenting

The Court today disagrees, though it cannot settle on a reason why. JUSTICE ALITO, joined by three other Justices, advances two theories—that the expert's summary of the Cellmark report was not offered for its truth, and that the report is not the kind of statement triggering the Confrontation Clause's protection. In the pages that follow, I call JUSTICE ALITO's opinion "the plurality," because that is the conventional term for it. But in all except its disposition, his opinion is a dissent: Five Justices specifically reject every aspect of its reasoning and every paragraph of its explication. See *ante,* at 1 (THOMAS, J., concurring in judgment) ("I share the dissent's view of the plurality's flawed analysis"). JUSTICE THOMAS, for his part, contends that the Cellmark report is nontestimonial on a different rationale. But no other Justice joins his opinion or subscribes to the test he offers.

That creates five votes to approve the admission of the Cellmark report, but not a single good explanation. The plurality's first rationale endorses a prosecutorial dodge; its second relies on distinguishing indistinguishable forensic reports. JUSTICE THOMAS's concurrence, though positing an altogether different approach, suffers in the end from similar flaws. I would choose another path—to adhere to the simple rule established in our decisions, for the good reasons we have previously given. Because defendants like Williams have a constitutional right to confront the witnesses against them, I respectfully dissent from the Court's fractured decision.

I

Our modern Confrontation Clause doctrine began with *Crawford* v. *Washington*, 541 U. S. 36 (2004). About a quarter century earlier, we had interpreted the Clause to allow the admission of any out-of-court statement falling within a "firmly rooted hearsay exception" or carrying "particularized guarantees of trustworthiness." *Ohio* v.

*Roberts*, 448 U. S. 56, 66 (1980). But in *Crawford*, we concluded that our old approach was misguided. Drawing on historical research about the Clause's purposes, we held that the prosecution may not admit "testimonial statements of a witness who [does] not appear at trial unless he [is] unavailable to testify, and the defendant . . . had a prior opportunity for cross-examination." 541 U. S., at 53–54. That holding has two aspects. First, the Confrontation Clause applies only to out-of-court statements that are "testimonial." Second, where the Clause applies, it guarantees to a defendant just what its name suggests—the opportunity to cross-examine the person who made the statement. See *id.,* at 59.

A few years later, we made clear that *Crawford*'s rule reaches forensic reports. In *Melendez-Diaz* v. *Massachusetts*, 557 U. S. 305 (2009), the Commonwealth introduced a laboratory's "'certificates of analysis'" stating that a substance seized from the defendant was cocaine. *Id.,* at 308. We held that the certificates fell within the Clause's "'core class of testimonial statements'" because they had a clear "evidentiary purpose": They were "'made under circumstances which would lead an objective witness reasonably to believe that [they] would be available for use at a later trial.'" *Id.,* at 310–311 (quoting *Crawford*, 541 U. S., at 51–52). Accordingly, we ruled, the defendant had a right to cross-examine the analysts who had authored them. In reaching that conclusion, we rejected the Commonwealth's argument that the Confrontation Clause should not apply because the statements resulted from "'neutral scientific testing,'" and so were presumptively reliable. 557 U. S., at 318. The Clause, we noted, commands that "'reliability be assessed in a particular manner'"—through "'testing in the crucible of cross-examination.'" *Id.,* at 317 (quoting *Crawford*, 541 U. S., at 61). Further, we doubted that the testing summarized in the certificates was "as neutral or as reliable" as the

Commonwealth suggested. Citing chapter and verse from various studies, we concluded that "[f]orensic evidence is not uniquely immune from the risk of manipulation" and mistake. 557 U. S., at 318; see *id.,* at 319.

And just two years later (and just one year ago), we reiterated *Melendez-Diaz'*s analysis when faced with a State's attempt to evade it. In *Bullcoming* v. *New Mexico*, 564 U. S. \_\_\_ (2011), a forensic report showed the defendant's blood-alcohol concentration to exceed the legal limit for drivers. The State tried to introduce that finding through the testimony of a person who worked at the laboratory but had not performed or observed the blood test or certified its results. We held that *Melendez-Diaz* foreclosed that tactic. The report, we stated, resembled the certificates in *Melendez-Diaz* in "all material respects," 564 U. S., at \_\_\_ (slip op., at 15): Both were signed documents providing the results of forensic testing designed to "'prov[e] some fact' in a criminal proceeding," *id.,* at \_\_\_ (slip op., at 14) (quoting *Melendez-Diaz*, 557 U. S., at 310). And the State's resort to a "surrogate" witness, in place of the analyst who produced the report, did not satisfy the Confrontation Clause. *Bullcoming*, 564 U. S*.,* at \_\_\_ (slip op., at 12). Only the presence of "that particular scientist," we reasoned, would enable Bullcoming's counsel to ask "questions designed to reveal whether incompetence . . . or dishonesty" had tainted the results. *Id.,* at \_\_\_, \_\_\_ (slip op., at 2, 12). Repeating the refrain of *Melendez-Diaz*, we held that "[t]he accused's right is to be confronted with" the actual analyst, unless he is unavailable and the accused "had an opportunity, pretrial, to cross-examine" him. *Bullcoming*, 564 U. S., at \_\_\_ (slip op., at 2).

This case is of a piece. The report at issue here shows a DNA profile produced by an analyst at Cellmark's laboratory, allegedly from a vaginal swab taken from a young woman, L. J., after she was raped. That report is identical to the one in *Bullcoming* (and *Melendez-Diaz*) in "all mate-

rial respects." 564 U. S., at ___ (slip op., at 15). Once again, the report was made to establish "'some fact' in a criminal proceeding"—here, the identity of L. J.'s attacker. *Id.,* at ___ (slip op., at 14) (quoting *Melendez-Diaz*, 557 U. S., at 310); see *infra*, at 20. And once again, it details the results of forensic testing on evidence gathered by the police. Viewed side-by-side with the *Bullcoming* report, the Cellmark analysis has a comparable title; similarly describes the relevant samples, test methodology, and results; and likewise includes the signatures of laboratory officials. Compare Cellmark Diagnostics Report of Laboratory Examination (Feb. 15, 2001), Lodging of Petitioner with App. in *Bullcoming* v. *New Mexico*, O. T. 2010, No. 09–10876, pp. 62–65. So under this Court's prior analysis, the substance of the report could come into evidence only if Williams had a chance to cross-examine the responsible analyst.

But that is not what happened. Instead, the prosecutor used Sandra Lambatos—a state-employed scientist who had not participated in the testing—as the conduit for this piece of evidence. Lambatos came to the stand after two other state analysts testified about forensic tests they had performed. One recounted how she had developed a DNA profile of Sandy Williams from a blood sample drawn after his arrest. And another told how he had confirmed the presence of (unidentified) semen on the vaginal swabs taken from L. J. All this was by the book: Williams had an opportunity to cross-examine both witnesses about the tests they had run. But of course, the State still needed to supply the missing link—it had to show that DNA found in the semen on L. J.'s vaginal swabs matched Williams's DNA. To fill that gap, the prosecutor could have called the analyst from Cellmark to testify about the DNA profile she had produced from the swabs. But instead, the State called Lambatos as an expert witness and had her testify that the semen on those swabs contained Sandy Wil-

liams's DNA:

> "**Q**  Was there a computer match generated of the male DNA profile found in semen from the vaginal swabs of [L. J.] to a male DNA profile that had been identified as having originated from Sandy Williams?
>
> "A  Yes, there was.
>
> "**Q**  Did you compare the semen . . . from the vaginal swabs of [L. J.] to the male DNA profile . . . from the blood of Sandy Williams?
>
> "A  Yes, I did.
>
> .         .         .         .         .
>
> "**Q**  [I]s the semen identified in the vaginal swabs of [L. J.] consistent with having originated from Sandy Williams?
>
> "A  Yes." App. 56–57.

And so it was Lambatos, rather than any Cellmark employee, who informed the trier of fact that the testing of L. J.'s vaginal swabs had produced a male DNA profile implicating Williams.

Have we not already decided this case?  Lambatos's testimony is functionally identical to the "surrogate testimony" that New Mexico proffered in *Bullcoming*, which did nothing to cure the problem identified in *Melendez-Diaz* (which, for its part, straightforwardly applied our decision in *Crawford*).  Like the surrogate witness in *Bullcoming*, Lambatos "could not convey what [the actual analyst] knew or observed about the events . . . , *i.e.*, the particular test and testing process he employed." *Bullcoming*, 564 U. S., at \_\_\_ (slip op., at 12).  "Nor could such

surrogate testimony expose any lapses or lies" on the testing analyst's part. *Ibid.* Like the lawyers in *Melendez-Diaz* and *Bullcoming*, Williams's attorney could not ask questions about that analyst's "proficiency, the care he took in performing his work, and his veracity." 564 U. S., at \_\_\_, n. 7 (slip op., at 12, n. 7). He could not probe whether the analyst had tested the wrong vial, inverted the labels on the samples, committed some more technical error, or simply made up the results. See App. to Brief for Public Defender Service for the District of Columbia et al. as *Amici Curiae* 5a, 11a (describing mistakes and fraud at Cellmark's laboratory). Indeed, Williams's lawyer was even more hamstrung than Bullcoming's. At least the surrogate witness in *Bullcoming* worked at the relevant laboratory and was familiar with its procedures. That is not true of Lambatos: She had no knowledge at all of Cellmark's operations. Indeed, for all the record discloses, she may never have set foot in Cellmark's laboratory.

Under our case law, that is sufficient to resolve this case. "[W]hen the State elected to introduce" the substance of Cellmark's report into evidence, the analyst who generated that report "became a witness" whom Williams "had the right to confront." *Bullcoming*, 564 U. S., at \_\_\_ (slip op., at 13). As we stated just last year, "Our precedent[s] cannot sensibly be read any other way." *Ibid.*

## II

The plurality's primary argument to the contrary tries to exploit a limit to the Confrontation Clause recognized in *Crawford*. "The Clause," we cautioned there, "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." 541 U. S., at 59–60, n. 9 (citing *Tennessee* v. *Street*, 471 U. S. 409, 414 (1985)). The Illinois Supreme Court relied on that statement in concluding that Lambatos's testimony was permissible. On that court's view, "Lambatos disclosed

the underlying facts from Cellmark's report" not for their truth, but "for the limited purpose of explaining the basis for her [expert] opinion," so that the factfinder could assess that opinion's value. 238 Ill. 2d 125, 150, 939 N. E. 2d 268, 282 (2010). The plurality wraps itself in that holding, similarly asserting that Lambatos's recitation of Cellmark's findings, when viewed through the prism of state evidence law, was not introduced to establish "the truth of any . . . matter concerning [the] Cellmark" report. *Ante*, at 16; see *ante,* at 2, 24–25. But five Justices agree, in two opinions reciting the same reasons, that this argument has no merit: Lambatos's statements about Cellmark's report went to its truth, and the State could not rely on her status as an expert to circumvent the Confrontation Clause's requirements. See *ante*, at 2–8 (opinion of THOMAS, J.).

To see why, start with the kind of case *Crawford* had in mind. In acknowledging the not-for-the-truth carveout from the Clause, the Court cited *Tennessee* v. *Street* as exemplary. See *Crawford*, 541 U. S., at 59–60, n. 9. There, Street claimed that his stationhouse confession of murder was a sham: A police officer, he charged, had read aloud his alleged accomplice's confession and forced him to repeat it. To help rebut that defense, the State introduced the other confession into the record, so the jury could see how it differed from Street's. This Court rejected Street's Confrontation Clause claim because the State had offered the out-of-court statement not to prove "the truth of [the accomplice's] assertions" about the murder, but only to disprove Street's claim of how the police elicited his confession. *Street*, 471 U. S., at 413. Otherwise said, the truth of the admitted statement was utterly immaterial; the only thing that mattered was that the statement (whether true or false) varied from Street's.

The situation could not be more different when a witness, expert or otherwise, repeats an out-of-court state-

ment as the basis for a conclusion, because the statement's utility is then dependent on its truth. If the statement is true, then the conclusion based on it is probably true; if not, not. So to determine the validity of the witness's conclusion, the factfinder must assess the truth of the out-of-court statement on which it relies. That is why the principal modern treatise on evidence variously calls the idea that such "basis evidence" comes in not for its truth, but only to help the factfinder evaluate an expert's opinion "very weak," "factually implausible," "nonsense," and "sheer fiction." D. Kaye, D. Bernstein, & J. Mnookin, The New Wigmore: Expert Evidence §4.10.1, pp. 196–197 (2d ed. 2011); *id.*, §4.11.6, at 24 (Supp. 2012). "One can sympathize," notes that treatise, "with a court's desire to permit the disclosure of basis evidence that is quite probably reliable, such as a routine analysis of a drug, but to pretend that it is not being introduced for the truth of its contents strains credibility." *Id.*, §4.10.1, at 198 (2d ed. 2011); see also, *e.g., People* v. *Goldstein*, 6 N. Y. 3d 119, 128, 843 N. E. 2d 727, 732–733 (2005) ("The distinction between a statement offered for its truth and a statement offered to shed light on an expert's opinion is not meaningful"). Unlike in *Street*, admission of the out-of-court statement in this context has no purpose separate from its truth; the factfinder can do nothing with it *except* assess its truth and so the credibility of the conclusion it serves to buttress.[1]

––––––––––

[1] In responding to this reasoning, the plurality confirms it. According to the plurality, basis evidence supports the "credibility of the expert's opinion" by showing that he has relied on, and drawn logical inferences from, sound "factual premises." *Ante*, at 24. Quite right. And that process involves assessing such premises' truth: If they are, as the majority puts it, "unsupported by other evidence in the record" or otherwise baseless, they will not "allay [a factfinder's] fears" about an "expert's reasoning." *Ante*, at 24–25. I could not have said it any better.

Consider a prosaic example not involving scientific experts. An eyewitness tells a police officer investigating an assault that the perpetrator had an unusual, star-shaped birthmark over his left eye. The officer arrests a person bearing that birthmark (let's call him Starr) for committing the offense. And at trial, the officer takes the stand and recounts just what the eyewitness told him. Presumably the plurality would agree that such testimony violates the Confrontation Clause unless the eyewitness is unavailable and the defendant had a prior opportunity to cross-examine him. Now ask whether anything changes if the officer couches his testimony in the following way: "I concluded that Starr was the assailant because a reliable eyewitness told me that the assailant had a star-shaped birthmark and, look, Starr has one just like that." Surely that framing would make no constitutional difference, even though the eyewitness's statement now explains the basis for the officer's conclusion. It remains the case that the prosecution is attempting to introduce a testimonial statement that has no relevance to the proceedings apart from its truth—and that the defendant cannot cross-examine the person who made it. Allowing the admission of this evidence would end-run the Confrontation Clause, and make a parody of its strictures.

And that example, when dressed in scientific clothing, is no different from this case. The Cellmark report identified the rapist as having a particular DNA profile (think of it as the quintessential birthmark). The Confrontation Clause prevented the State from introducing that report into evidence except by calling to the stand the person who prepared it. See *Melendez-Diaz*, 557 U. S., at 310–311; *Bullcoming*, 564 U. S., at \_\_\_ (slip op., at 2). So the State tried another route—introducing the substance of the report as part and parcel of an expert witness's conclusion. In effect, Lambatos testified (like the police officer above): "I concluded that Williams was the rapist because Cell-

mark, an accredited and trustworthy laboratory, says that the rapist has a particular DNA profile and, look, Williams has an identical one." And here too, that form of testimony should change nothing. The use of the Cellmark statement remained bound up with its truth, and the statement came into evidence without any opportunity for Williams to cross-examine the person who made it. So if the plurality were right, the State would have a ready method to bypass the Constitution (as much as in my hypothetical case); a wink and a nod, and the Confrontation Clause would not pose a bar to forensic evidence.

The plurality tries to make plausible its not-for-the-truth rationale by rewriting Lambatos's testimony about the Cellmark report. According to the plurality, Lambatos merely "assumed" that Cellmark's DNA profile came from L. J.'s vaginal swabs, accepting for the sake of argument the prosecutor's premise. *Ante*, at 18. But that is incorrect. Nothing in Lambatos's testimony indicates that she was making an assumption or considering a hypothesis. To the contrary, Lambatos affirmed, without qualification, that the Cellmark report showed a "male DNA profile found in semen from the vaginal swabs of [L. J.]." App. 56. Had she done otherwise, this case would be different. There was nothing wrong with Lambatos's testifying that two DNA profiles—the one shown in the Cellmark report and the one derived from Williams's blood—matched each other; that was a straightforward application of Lambatos's expertise. Similarly, Lambatos could have added that *if* the Cellmark report resulted from scientifically sound testing of L. J.'s vaginal swab, *then* it would link Williams to the assault. What Lambatos could not do was what she did: indicate that the Cellmark report *was* produced in this way by saying that L. J.'s vaginal swab contained DNA matching Williams's.[2] By testifying in

--------

[2] The plurality suggests that Lambatos's testimony is merely a mod-

that manner, Lambatos became just like the surrogate witness in *Bullcoming*—a person knowing nothing about "the particular test and testing process," but vouching for them regardless. 564 U. S., at ___ (slip op., at 12). We have held that the Confrontation Clause requires something more.

The plurality also argues that Lambatos's characterization of the Cellmark report did not violate the Confrontation Clause because the case "involve[d] a bench trial." *Ante*, at 19 (emphasis deleted). I welcome the plurality's concession that the Clause might forbid presenting Lambatos's statement to a jury, see *ante*, at 18–19; it indicates that the plurality realizes that her testimony went beyond an "assumption." But the presence of a judge does not transform the constitutional question. In applying the Confrontation Clause, we have never before considered relevant the decisionmaker's identity. See, *e.g., Davis* v.

——————

ern, streamlined way of answering hypothetical questions and therefore raises no constitutional issue, see *ante*, at 2, 13–15; similarly, the plurality contends that the difference between what Lambatos said and what I would allow involves only "slightly revis[ing]" her testimony and so can be of no consequence, see *ante,* at 18, n. 3. But the statement "if X is true, then Y follows" differs materially—and constitutionally— from the statement "Y is true because X is true (according to Z)." The former statement is merely a logical proposition, whose validity the defendant can contest by questioning the speaker. And then, assuming the prosecutor tries to prove the statement's premise through some other witness, the defendant can rebut that effort through cross-examination. By contrast, the latter statement as well contains a factual allegation (that X is true), which the defendant can only effectively challenge by confronting the person who made it (Z). That is why recognizing the difference between these two forms of testimony is not to insist on an archaism or a formality, but to ensure, in line with the Constitution, that defendants have the ability to confront their accusers. And if prosecutors can easily conform their conduct to that constitutional directive, as the plurality suggests, so much the better: I would not have thought it a ground of complaint that the Confrontation Clause, properly understood, manages to protect defendants without overly burdening the State.

*Washington*, 547 U. S. 813 (2006). And this case would be a poor place to begin. Lambatos's description of the Cellmark report was offered for its truth because that is all such "basis evidence" can be offered for; as described earlier, the only way the factfinder could consider whether that statement supported her opinion (that the DNA on L. J.'s swabs came from Williams) was by assessing the statement's truth. See *supra,* at 9–12. That is so, as a simple matter of logic, whether the factfinder is a judge or a jury. And thus, in either case, admission of the statement, without the opportunity to cross-examine, violates the Confrontation Clause. See *ante*, at 3–4, n. 1 (opinion of THOMAS, J.).

In saying that much, I do not doubt that a judge typically will do better than a jury in excluding such inadmissible evidence from his decisionmaking process. Perhaps the judge did so here; perhaps, as the plurality thinks, he understood that he could not consider Lambatos's representation about the Cellmark report, and found that other, "circumstantial evidence" established "the source of the sample that Cellmark tested" and "the reliability of the Cellmark profile." See *ante*, at 22–23. Some indications are to the contrary: In delivering his verdict, the judge never referred to the circumstantial evidence the plurality marshals, but instead focused only on Lambatos's testimony. See 4 Record JJJ151 (calling Lambatos "the best DNA witness I have ever heard" and referring to Williams as "the guy whose DNA, according to the evidence from the experts, is in the semen recovered from the victim's vagina"). But I take the plurality's point that when read "[i]n context" the judge's statements might be "best understood" as meaning something other than what they appear to say. See *ante*, at 20, n. 6. Still, that point suggests only that the admission of Lambatos's statement was harmless—that the judge managed to put it out of mind. After all, whether a factfinder is confused by an error is a sepa-

rate question from whether an error has occurred. So the plurality's argument does not answer the only question this case presents: whether a constitutional violation happened when Lambatos recited the Cellmark report's findings.[3]

At bottom, the plurality's not-for-the-truth rationale is a simple abdication to state-law labels. Although the utility of the Cellmark statement that Lambatos repeated logically depended on its truth, the plurality thinks this case decided by an Illinois rule holding that the facts underlying an expert's opinion are not admitted for that purpose. See *ante*, at 14–18; *People* v. *Pasch*, 152 Ill. 2d 133, 175–177, 604 N. E. 2d 294, 311 (1992). But we do not typically allow state law to define federal constitutional requirements. And needless to say (or perhaps not), the Confron-

_____

[3] The plurality asserts (without citation) that I am "reach[ing] the truly remarkable conclusion that the wording of Lambatos' testimony confused the trial judge," *ante*, at 19, and then spends three pages explaining why that conclusion is wrong, see *ante*, at 19–21. But the plurality is responding to an argument of its own imagining, because I reach no such conclusion. As I just stated, the trial judge might well have ignored Lambatos's statement about the Cellmark report and relied on other evidence to conclude that "the Cellmark profile was derived from the sample taken from the victim," *ante*, at 19. All I am saying is that the admission of that statement violated the Confrontation Clause even if the judge ultimately put it aside, because it came into evidence for nothing other than its truth. See *supra,* at 9–12.

Similarly, the plurality claims (still without citation) that I think the other evidence about the Cellmark report insufficient, see *ante*, at 21. But once again, the plurality must be reading someone else's opinion. I express no view on sufficiency of the evidence because it is irrelevant to the Confrontation Clause issue we took this case to decide. It is the plurality that wrongly links the two, spending another five pages trumpeting the strength of the Cellmark report, see *ante*, at 22–24, 32–33. But the plurality cannot properly decide whether a Confrontation Clause violation occurred at Williams's trial by determining that Williams was guilty. The American criminal justice system works the opposite way: determining guilt by holding trials in accord with constitutional requirements.

tation Clause is a constitutional rule like any other. As
JUSTICE THOMAS observes, even before *Crawford*, we did
not allow the Clause's scope to be "dictated by state or
federal evidentiary rules." See *ante*, at 2. Indeed, in
*Street*, we independently reviewed whether an out-of-court
statement was introduced for its truth—the very question
at issue in this case. See 471 U. S., at 413–416. And in
*Crawford*, we still more firmly disconnected the Confron-
tation Clause inquiry from state evidence law, by overrul-
ing an approach that looked in part to whether an out-
of-court statement fell within a "'firmly rooted hearsay
exception.'" 541 U. S., at 60 (quoting *Roberts*, 448 U. S., at
66). That decision made clear that the Confrontation
Clause's protections are not coterminous with rules of
evidence. So the plurality's state-law-first approach would
be an about-face.

Still worse, that approach would allow prosecutors to do
through subterfuge and indirection what we previously
have held the Confrontation Clause prohibits. Imagine
for a moment a poorly trained, incompetent, or dishonest
laboratory analyst. (The analyst in *Bullcoming*, placed on
unpaid leave for unknown reasons, might qualify.) Under
our precedents, the prosecutor cannot avoid exposing that
analyst to cross-examination simply by introducing his
report. See *Melendez-Diaz*, 557 U. S., at 311. Nor can the
prosecutor escape that fate by offering the results through
the testimony of another analyst from the laboratory. See
*Bullcoming*, 564 U. S., at ___ (slip op., at 2)**.** But under
the plurality's approach, the prosecutor could choose the
analyst-witness of his dreams (as the judge here said, "the
best DNA witness I have ever heard"), offer her as an
expert (she knows nothing about the test, but boasts im-
pressive degrees), and have her provide testimony identi-
cal to the best the actual tester might have given ("the
DNA extracted from the vaginal swabs matched Sandy
Williams's")—all so long as a state evidence rule says that

the purpose of the testimony is to enable the factfinder to assess the expert opinion's basis. (And this tactic would not be confined to cases involving scientific evidence. As JUSTICE THOMAS points out, the prosecutor could similarly substitute experts for all kinds of people making out-of-court statements. See *ante,* at 7.) The plurality thus would countenance the Constitution's circumvention. If the Confrontation Clause prevents the State from getting its evidence in through the front door, then the State could sneak it in through the back. What a neat trick—but really, what a way to run a criminal justice system. No wonder five Justices reject it.

### III

The plurality also argues, as a "second, independent basis" for its decision, that the Cellmark report falls outside the Confrontation Clause's ambit because it is nontestimonial. *Ante*, at 3. The plurality tries out a number of supporting theories, but all in vain: Each one either conflicts with this Court's precedents or misconstrues this case's facts. JUSTICE THOMAS rejects the plurality's views for similar reasons as I do, thus bringing to five the number of Justices who repudiate the plurality's understanding of what statements count as testimonial. See *ante*, at 1, 12–15. JUSTICE THOMAS, however, offers a rationale of his own for deciding that the Cellmark report is nontestimonial. I think his essay works no better. When all is said and done, the Cellmark report is a testimonial statement.

### A

According to the plurality, we should declare the Cellmark report nontestimonial because "the use at trial of a DNA report prepared by a modern, accredited laboratory 'bears little if any resemblance to the historical practices that the Confrontation Clause aimed to eliminate.'" *Ante*, at 33 (quoting *Michigan* v. *Bryant*, 562 U. S. \_\_\_, \_\_\_

(2011) (THOMAS, J., concurring in judgment) (slip op., at 2)). But we just last year treated as testimonial a forensic report prepared by a "modern, accredited laboratory"; indeed, we declared that the report at issue "fell within the core class of testimonial statements" implicating the Confrontation Clause. *Bullcoming*, 564 U. S., at ___ (slip op., at 16) (internal quotation marks omitted); see Brief for New Mexico Department of Health, Scientific Laboratory Division as *Amicus Curiae* in *Bullcoming*, O. T. 2010, No. 09–10786, p. 1 (discussing accreditation). And although the plurality is close, it is not quite ready (or able) to dispense with that decision. See *ante*, at 29, n. 13 ("Experience might yet show that the holdings in [*Bullcoming* and other post-*Crawford*] cases should be reconsidered"). So the plurality must explain: What could support a distinction between the laboratory analysis there and the DNA test in this case?[4]

As its first stab, the plurality states that the Cellmark report was "not prepared for the primary purpose of accusing a targeted individual." *Ante*, at 31. Where that test comes from is anyone's guess. JUSTICE THOMAS rightly shows that it derives neither from the text nor from the

———————

[4] JUSTICE BREYER does not attempt to distinguish our precedents, opting simply to adhere to "the dissenting view set forth in *Melendez-Diaz* and *Bullcoming*." See *ante*, at 8 (concurring opinion). He principally worries that under those cases, a State will have to call to the witness stand "[s]ix to twelve or more technicians" who have worked on a report. See *ante*, at 5; see also *ante*, at 3, 16–18. But none of our cases—including this one—has presented the question of *how many* analysts must testify about a given report. (That may suggest that in most cases a lead analyst is readily identifiable.) The problem in the cases—again, including this one—is that *no* analyst came forward to testify. In the event that some future case presents the multiple-technician issue, the Court can focus on "the broader 'limits' question" that troubles JUSTICE BREYER, *ante*, at 7. But the mere existence of that question is no reason to wrongly decide the case before us—which, it bears repeating, involved the testimony of not twelve or six or three or one, but zero Cellmark analysts.

history of the Confrontation Clause. See *ante*, at 14–15 (opinion concurring in judgment). And it has no basis in our precedents. We have previously asked whether a statement was made for the primary purpose of establishing "past events potentially relevant to later criminal prosecution"—in other words, for the purpose of providing evidence. *Davis*, 547 U. S., at 822; see also *Bullcoming*, 564 U. S., at \_\_\_ (slip op., at 14); *Bryant*, 562 U. S., at \_\_\_, \_\_\_ (slip op., at 14, 29); *Melendez-Diaz*, 557 U. S., at 310–311; *Crawford*, 541 U. S., at 51–52. None of our cases has ever suggested that, in addition, the statement must be meant to accuse a previously identified individual; indeed, in *Melendez-Diaz*, we rejected a related argument that laboratory "analysts are not subject to confrontation because they are not 'accusatory' witnesses." 557 U. S., at 313.

Nor does the plurality give any good reason for adopting an "accusation" test. The plurality apparently agrees with JUSTICE BREYER that prior to a suspect's identification, it will be "unlikely that a particular researcher has a defendant-related motive to behave dishonestly." *Ante*, at 12 (BREYER, J., concurring); see *ante*, at 31–32 (plurality opinion). But surely the typical problem with laboratory analyses—and the typical focus of cross-examination—has to do with careless or incompetent work, rather than with personal vendettas. And as to that predominant concern, it makes not a whit of difference whether, at the time of the laboratory test, the police already have a suspect.[5]

_____

[5] Neither can the plurality gain any purchase from the idea that a DNA profile is not "inherently inculpatory" because it "tends to exculpate all but one of the more than 7 billion people in the world today." *Ante*, at 3; see *ante*, at 32. *All* evidence shares this feature: the more inculpatory it is of a single person, the more exculpatory it is of the rest of the world. The one is but the flipside of the other. But no one has ever before suggested that this logical corollary provides a reason to ignore the Constitution's efforts to ensure the reliability of evidence.

The plurality next attempts to invoke our precedents holding statements nontestimonial when made "to respond to an 'ongoing emergency,'" rather than to create evidence for trial, *Bryant*, 562 U. S., at ___ (slip op., at 11); here, the plurality insists, the Cellmark report's purpose was "to catch a dangerous rapist who was still at large." *Ante*, at 31. But that is to stretch both our "ongoing emergency" test and the facts of this case beyond all recognition. We have previously invoked that test to allow statements by a woman who was being assaulted and a man who had just been shot. In doing so, we stressed the "informal [and] harried" nature of the statements, *Bryant*, 562 U. S., at ___ (slip op., at 31)—that they were made as, or "minutes" after, *id.*, at ___ (slip op., at 28), the events they described "actually happen[ed]," *Davis*, 547 U. S., at 827 (emphasis deleted), by "frantic" victims of criminal attacks, *ibid.*, to officers trying to figure out "what had . . . occurred" and what threats remained, *Bryant*, 562 U. S., at ___ (slip op., at 30) (internal quotation marks omitted). On their face, the decisions have nothing to say about laboratory analysts conducting routine tests far away from a crime scene. And this case presents a peculiarly inapt set of facts for extending those precedents. Lambatos testified at trial that "all reports in this case were prepared for this criminal investigation . . . [a]nd for the purpose of the eventual litigation," App. 82—in other words, for the purpose of producing evidence, not enabling emergency responders. And that testimony fits the relevant timeline. The police did not send the swabs to Cellmark until November 2008—nine months after L. J.'s rape—and did not receive the results for another four months. See *id.,* at 30–34, 51–52, 54. That is hardly the typical emergency response.

Finally, the plurality offers a host of reasons for why reports like this one are reliable: "[T]here [i]s no prospect of fabrication," *ante*, at 31 (internal quotation marks omitted); multiple technicians may "work on each DNA

profile," *ante*, at 32; and "defects in a DNA profile may often be detected from the profile itself," *ibid.* See also *ante*, at 10–14 (opinion of BREYER, J.). But once again: Been there, done that. In *Melendez-Diaz*, this Court rejected identical arguments, noting extensive documentation of "[s]erious deficiencies . . . in the forensic evidence used in criminal trials." 557 U. S., at 319; see *supra,* at 4–5; see also *Bullcoming*, 564 U. S., at ___, n. 1 (slip op., at 4, n. 1) (citing similar errors in laboratory analysis); Brief for Public Defender Service for the District of Columbia et al. as *Amici Curiae* 13 (discussing "[s]ystemic problems," such as sample contamination, sample switching, mislabeling, and fraud, at "'flagship' DNA labs"). Scientific testing is "technical," to be sure, *ante*, at 1 (opinion of BREYER, J.); but it is only as reliable as the people who perform it. That is why a defendant may wish to ask the analyst a variety of questions: How much experience do you have? Have you ever made mistakes in the past? Did you test the right sample? Use the right procedures? Contaminate the sample in any way? Indeed, as scientific evidence plays a larger and larger role in criminal prosecutions, those inquiries will often be the most important in the case.[6]

––––––––

[6] Both the plurality and JUSTICE BREYER warn that if we require analysts to testify, we will encourage prosecutors to forgo DNA evidence in favor of less reliable eyewitness testimony and so "increase the risk of convicting the innocent." *Ante*, at 13 (BREYER, J., concurring); see *ante*, at 3–4 (plurality opinion). Neither opinion provides any evidence, even by way of anecdote, for that view, and I doubt any exists. DNA evidence is usually the prosecutor's most powerful weapon, and a prosecutor is unlikely to relinquish it just because he must bring the right analyst to the stand. Consider what Lambatos told the factfinder here: The DNA in L. J.'s vaginal swabs matched Williams's DNA and would match only "1 in 8.7 quadrillion black, 1 in 390 quadrillion white, or 1 in 109 quadrillion Hispanic unrelated individuals." App. 56–57. No eyewitness testimony could replace that evidence. I note as well that the Innocence Network—a group particularly knowledgeable about the

And *Melendez-Diaz* made yet a more fundamental point in response to claims of the *über alles* reliability of scientific evidence: It is not up to us to decide, *ex ante*, what evidence is trustworthy and what is not. See 557 U. S., at 317–318; see also *Bullcoming*, 564 U. S., at ___ (slip op., at 11). That is because the Confrontation Clause prescribes its own "procedure for determining the reliability of testimony in criminal trials." *Crawford*, 541 U. S., at 67. That procedure is cross-examination. And "[d]ispensing with [it] because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty." *Id.,* at 62.

So the plurality's second basis for denying Williams's right of confrontation also fails. The plurality can find no reason consistent with our precedents for treating the Cellmark report as nontestimonial. That is because the report is, in every conceivable respect, a statement meant to serve as evidence in a potential criminal trial. And that simple fact should be sufficient to resolve the question.

B

JUSTICE THOMAS's unique method of defining testimonial statements fares no better. On his view, the Confrontation Clause "regulates only the use of statements bearing 'indicia of solemnity.'" *Ante*, at 8 (quoting *Davis*, 547 U. S., at 836–837). And Cellmark's report, he concludes, does not qualify because it is "neither a sworn nor a certified declaration of fact." *Ante,* at 9. But JUSTICE THOMAS's approach grants constitutional significance to minutia, in a way that can only undermine the Confrontation Clause's protections.

————————

kinds of evidence that produce erroneous convictions—disagrees with the plurality's and JUSTICE BREYER's view. It argues here that "[c]onfrontation of the analyst . . . is essential to permit proper adversarial testing" and so to *decrease* the risk of convicting the innocent. Brief for the Innocence Network as *Amicus Curiae* 3, 7.

To see the point, start with precedent, because the Court rejected this same kind of argument, as applied to this same kind of document, at around this same time just last year. In *Bullcoming*, the State asserted that the forensic report at issue was nontestimonial because— unlike the report in *Melendez-Diaz*—it was not sworn before a notary public. We responded that applying the Confrontation Clause only to a sworn forensic report "would make the right to confrontation easily erasable"— next time, the laboratory could file the selfsame report without the oath. 564 U. S., at \_\_\_ (slip op., at 15). We then held, as noted earlier, that "[i]n all material respects," the forensic report in *Bullcoming* matched the one in *Melendez-Diaz*. 564 U. S., at \_\_\_ (slip op., at 15); see *supra,* at 5. First, a law enforcement officer provided evidence to a state laboratory assisting in police investigations. See 564 U. S., at \_\_\_ (slip op., at 15). Second, the analyst tested the evidence and "prepared a certificate concerning the result[s]." *Ibid.* Third, the certificate was "formalized in a signed document . . . headed a 'report.'" *Ibid.* (some internal quotation marks omitted). That was enough.

Now compare that checklist of "material" features to the report in this case. The only differences are that Cellmark is a private laboratory under contract with the State (which no one thinks relevant), and that the report is not labeled a "certificate." That amounts to (maybe) a nickel's worth of difference: The similarities in form, function, and purpose dwarf the distinctions. See *supra,* at 5–6. Each report is an official and signed record of laboratory test results, meant to establish a certain set of facts in legal proceedings. Neither looks any more "formal" than the other; neither *is* any more formal than the other. See *ibid.* The variances are no more (probably less) than would be found if you compared different law schools' transcripts or different companies' cash flow statements or different

States' birth certificates. The difference in labeling—a "certificate" in one case, a "report of laboratory examination" in the other—is not of constitutional dimension.

Indeed, JUSTICE THOMAS's approach, if accepted, would turn the Confrontation Clause into a constitutional geegaw—nice for show, but of little value. The prosecution could avoid its demands by using the right kind of forms with the right kind of language. (It would not take long to devise the magic words and rules—principally, never call anything a "certificate.")[7] And still worse: The new conventions, precisely by making out-of-court statements less "solem[n]," *ante*, at 1, would also make them less reliable—and so turn the Confrontation Clause upside down. See *Crawford*, 541 U. S., at 52–53, n. 3 ("We find it implausible that a provision which concededly condemned trial by sworn *ex parte* affidavit thought trial by *unsworn ex parte* affidavit perfectly OK"). It is not surprising that no other Member of the Court has adopted this position. To do so, as JUSTICE THOMAS rightly says of the plurality's decision, would be to "diminis[h] the Confrontation Clause's protection" in "the very cases in which the accused *should* 'enjoy the right . . . to be confronted with the witnesses against him.'" *Ante*, at 16.

## IV

Before today's decision, a prosecutor wishing to admit the results of forensic testing had to produce the technician responsible for the analysis. That was the result of not one, but two decisions this Court issued in the last three years. But that clear rule is clear no longer. The five Justices who control the outcome of today's case agree

---

[7]JUSTICE THOMAS asserts there is no need to worry, because "the Confrontation Clause reaches bad-faith attempts to evade the formalized process." *Ante,* at 10; see *ante*, at 9, n. 5. I hope he is right. But JUSTICE THOMAS provides scant guidance on how to conduct this novel inquiry into motive.

on very little. Among them, though, they can boast of two accomplishments. First, they have approved the introduction of testimony at Williams's trial that the Confrontation Clause, rightly understood, clearly prohibits. Second, they have left significant confusion in their wake. What comes out of four Justices' desire to limit *Melendez-Diaz* and *Bullcoming* in whatever way possible, combined with one Justice's one-justice view of those holdings, is—to be frank—who knows what. Those decisions apparently no longer mean all that they say. Yet no one can tell in what way or to what extent they are altered because no proposed limitation commands the support of a majority.

The better course in this case would have been simply to follow *Melendez-Diaz* and *Bullcoming*. Precedent-based decisionmaking provides guidance to lower court judges and predictability to litigating parties. Today's plurality and concurring opinions, and the uncertainty they sow, bring into relief that judicial method's virtues. I would decide this case consistently with, and for the reasons stated by, *Melendez-Diaz* and *Bullcoming*. And until a majority of this Court reverses or confines those decisions, I would understand them as continuing to govern, in every particular, the admission of forensic evidence.

I respectfully dissent.